Britton L. McPHERSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000379–MR.

Supreme Court of Kentucky.

Feb. 23, 2012.

Erin Hoffman Yang, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General of Kentucky, Courtney J. Hightower, Assistant Attorney General, Office of Attorney Gen-

eral Criminal Appellate Division, Frankfort, KY, for Appellee.

Opinion of the Court by Justice ABRAMSON.

Britton McPherson appeals as of right from a Judgment of the Muhlenberg Circuit Court convicting him of murder and sentencing him in accord with the jury's recommendation to life in prison. McPherson was found guilty of the June 29, 2008 slaying of Lora Milligan on a farm road outside Central City. He claims on appeal that he was denied a fair trial because he was not allowed to question Tamala Parker, his former girlfriend and alleged accomplice in the murder, concerning a prior conviction and her other prior run-ins with the police, and because he was denied a missing evidence instruction concerning Parker's interrogation by a St. Louis homicide detective. McPherson also maintains that his sentencing by a second jury impaneled after the initial jury could not agree on a sentence runs afoul of his right to judicial sentencing as provided by Kentucky Revised Statute (KRS) 532.055. Finding no error, we affirm McPherson's conviction and sentence.

### RELEVANT FACTS

The Commonwealth's proof, developed in the course of a three-day trial, gave a disturbing glimpse of the drug culture in Muhlenberg County. The victim, Milligan, Appellant McPherson, and Parker were all acquaintances of many years. They frequently exchanged and shared drugs, including narcotic pain medicines, and used them in each other's company. In 2007, Milligan, in trouble for having passed bad checks, agreed to cooperate with officers in the Pennyrile Narcotics Task Force by recording others in the act of selling drugs. One of the persons against whom she gathered evidence was Richard Smith, characterized at trial as a "well known drug dealer" in the area. Smith was another long-time acquaintance of McPherson, a particularly close one. Evidence against Smith had led to his indictment for trafficking, and his trial was scheduled for July 2008. It was known apparently that Lora Milligan was to be one of the witnesses against him. According to Parker's testimony, in June 2008 Smith offered McPherson "cash and pills" for the murder of Milligan. McPherson in turn recruited Parker, with whom he had been living for several months. Initially, Parker testified, she rejected the idea, but desperate for money she eventually agreed.

On the morning of June 29, McPherson and Parker drove Milligan to a secluded spot on Hall Road in Muhlenberg County ostensibly to "get high." According to Parker, Milligan had trouble injecting herself and would let Parker do it for her. The plan was for Parker to inject Milligan with insulin instead of morphine, a switch McPherson anticipated would be fatal. Parker testified that at the last moment she lost her nerve and emptied the syringe of insulin onto the floor of the car.

That plan having failed, McPherson then borrowed a 9–mm handgun from his half-brother, Shannon Geary, a favor Geary agreed to in exchange for morphine. McPherson then stole three rounds of ammunition from the Rural King store in Central City. Thus armed, in the early evening of June 29, about six o'clock according to Parker, McPherson and Parker again arranged to drive Milligan out of town, this time to a gravel farm road off of Moorman Cemetery Road.[1] There, according to Parker, while she and Milligan were

---

1. From the record, it is unclear whether the Hall Road and the Moorman Cemetery Road are different places or merely different names for the same place.

walking side-by-side, McPherson rushed up behind Milligan and shot her in the head.

After the shooting, McPherson and Parker drove back to Central City to an apartment where their friends, Keith and Tracy Presley, were staying. From there, Parker testified, McPherson contacted Smith. He then left for a short time and when he returned was in possession of a large wad of cash amounting to several hundred dollars. The two couples then drove to Moorman where McPherson returned the gun to Shannon Geary. Then, with McPherson paying for everything, the foursome obtained drugs, food, and a motel room for the night. During the evening, Parker testified, she revealed the murder to the Presleys, and it was her belief that McPherson told them of it too. She testified that she and McPherson stayed at different area motels the next few nights and that on July 3, 2008, after McPherson had received another couple of hundred dollars from Smith, they bought bus tickets and left Kentucky for St. Louis.

In the meantime, Milligan's body was discovered on July 2. Underneath the body, the police found Milligan's cell phone, and they were able to determine that the last calls to and from that phone were from and to a phone registered to Parker. Parker was wanted for having violated her parole, so when the police learned that she had purchased bus tickets to St. Louis, they contacted officials there who arrested Parker at the bus station on the evening of July 3. Initially, McPherson was not detained, but he elected to stay with Parker. A St. Louis homicide detective, Detective Harrington, interviewed Parker, and she gave a statement implicating herself and McPherson in the killing. At the same time, Keith Presley had contacted the Kentucky State Police in Muhlenberg County, and he and his wife gave

statements recounting what Parker and McPherson had told them and also what the four of them had done together on June 29 and the following days.

In August 2008, a Muhlenberg County grand jury indicted Parker and McPherson separately for Milligan's murder. Parker eventually pled guilty to second-degree manslaughter and agreed to testify against both McPherson and Richard Smith in exchange for a ten-year sentence enhanced to twenty years by virtue of her PFO status. McPherson's case was tried in March 2010. In addition to Parker's testimony, the Commonwealth's case included ballistics evidence confirming that the murder weapon was indeed a gun belonging to Shannon Geary's mother and forensic evidence identifying a fiber found on Milligan's shirt as having come from the car that Parker and McPherson were driving. Shannon Geary testified that he had loaned his mother's gun to McPherson on June 29 and that McPherson, together with Parker and the Presleys, had returned the gun that same evening. Mark Adams, McPherson's cellmate for a time, testified that McPherson had talked of having shot an informant in the head. Finally, the Presleys testified about Parker burning Milligan's ID card, McPherson suddenly acquiring a large amount of cash and the visit they all paid to Shannon Geary. The Presleys also testified that both Parker and McPherson admitted killing Milligan.

McPherson put on an alibi defense buttressed with evidence of an alternate perpetrator. Richard Smith's cousin, Jack Higgs, who admitted that he was a convicted felon and that he and McPherson had been close friends for years, testified that early in the afternoon of June 29, he and McPherson had driven to Nashville in Higgs's car. Before they left, according to Higgs, McPherson had told him about a

gun that he, McPherson, had borrowed to frighten someone in Louisville who had "ripped him off" and to get his money back. Higgs, however, because he was a convicted felon and did not want to risk being charged with possession of the gun, insisted that McPherson leave it with Parker. The two friends, Higgs testified, went to Nashville to sell drugs, and McPherson made about three hundred dollars. They had not returned to Central City until late that evening, about seven or eight o'clock.

McPherson also presented testimony by two of Parker's cellmates, Terra White and Brandy Edmonds. Parker admitted to them, they claimed, that she was "putting things off on" McPherson and that she and Keith Presley had been having an affair. Edmonds testified further that Parker told her that McPherson had borrowed the gun because he wanted to rob someone in Nashville, but that she, Parker, had talked him into leaving the gun in their motel room. It was she and Keith Presley who had stolen ammunition from Rural King, and both of them believed that Milligan had informed on them. Edmonds testified that in effect Parker told her that she, Parker, and not McPherson, had killed Milligan.

If the jury had believed Higgs, White, and Edmonds, then it likely would not have found McPherson guilty, and so to that extent the trial pitted the credibility of McPherson's witnesses against that of Adams, the Presleys, and Parker. With Parker's testimony weighing so heavily against him, McPherson focuses his appeal on what he insists were improper limitations on his attempt to discredit her testimony and to show that Parker, not he, was the guilty party. He contends first that beyond merely asking her whether she had been convicted of a felony, as Kentucky Rule of Evidence (KRE) 609 allows, he

should have been permitted to question Parker about the nature and specifics of her prior crime, as KRE 609 disallows. Our analysis begins with this contention.

## ANALYSIS

### I. The Trial Court Did Not Err By Excluding Evidence Concerning the Nature of Parker's Prior Crime.

In 2005, apparently, Parker was arrested on a trafficking charge and while housed at the jail made a phone call to the person she believed had informed against her. She told that person that he "was dead." The threat was recorded, as were all calls on the jail's phones, and because of it she was charged with and eventually pled guilty to the offense of retaliating against a participant in a legal proceeding. McPherson sought to question Parker about this incident both to impeach her testimony and to show substantively that she was violently inclined toward "informants" against her. The trial court disallowed the questioning and explained that in its view the prior incident was only marginally relevant and that whatever substantive value it had was substantially outweighed by the risk of confusing or misleading the jury. McPherson contends that Parker's prior offense is far more probative than the trial court believed and should have been admitted under both KRE 404(b) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

■ We begin by noting that to the extent McPherson sought to *impeach* Parker with the details of her prior crime, the trial court correctly excluded the evidence. KRE 609(a) limits the use for impeachment purposes of a prior felony conviction to the fact of conviction and expressly disallows disclosure "of the crime upon which conviction was based ... unless the

witness has denied the existence of the conviction." Parker did not deny her conviction, and the crime—the threat against the purported informant—said nothing about Parker's honesty or any bias she may have had against McPherson. The evidence was not admissible under the rule, therefore, and there is no reason to think that the evidence should have been admitted despite the rule. *See Beaty v. Commonwealth,* 125 S.W.3d 196, 206 (Ky. 2003) (noting that the Confrontation Clause of the federal Sixth Amendment "is only implicated if the excluded cross-examination concerns a matter giving the witness reason to testify falsely during the trial at hand."). The trial court correctly excluded the prior crime evidence to the extent that it was offered as impeachment.

McPherson's main contention, however, is that Parker's prior threat was substantive evidence tending to show the depth of her animus against those who would inform against her, evidence making it more likely than might otherwise appear that she, and not McPherson, had perpetrated the assault upon Milligan. As McPherson correctly notes, although reiterating that evidence of a person's prior crimes or bad acts is not admissible merely as proof of the person's bad character, KRE 404(b) permits the admission of such evidence for other substantive purposes such as proof of motive, opportunity, intent, or identity. We have cautioned, however, that such evidence "is not admissible just because a party asserts that [it] tends to support one of the above listed purposes." *Commonwealth v. Maddox,* 955 S.W.2d 718, 722 (Ky.1997).

In *Maddox,* a case like this one in which the defendant invoked KRE 404(b) as authorizing evidence of an alleged alternate perpetrator's prior bad act—in that case an act of child molesting said to identify the molester as a likely perpetrator of the child killing with which the defendant was charged—we upheld the trial court's exclusion of the reverse KRE 404(b) evidence and explained that even when offered by the defendant, evidence of a person's prior bad act may be admissible to establish identity only if "the prior uncharged act is sufficiently similar to the charged act so as to indicate a reasonable probability that the acts were committed by the same person." 955 S.W.2d at 722. The alleged molester's brief act of oral sodomy was not sufficiently like the brutal beating in the case being tried to meet that test, and thus the trial court had correctly excluded the prior-act evidence.

In *Blair v. Commonwealth,* 144 S.W.3d 801 (Ky.2004), another case in which a defendant sought to introduce evidence of a witness's prior crime in an attempt to show that the witness had a motive to commit the crime of which the defendant was charged, we distinguished between prior-crime evidence offered by the Commonwealth against an accused and such evidence offered defensively by the accused—reverse 404(b) evidence—and explained that in the latter case the reverse 404(b) evidence need not meet the very high standard of admissibility used to screen evidence of the defendant's prior bad acts, but must still be sufficiently probative and relevant to satisfy KRE 403. That rule, of course, permits the exclusion of relevant evidence the probative value of which is substantially outweighed by its potential to confuse or mislead the jury.

■ Here, as in *Maddox,* Parker's telephone threat, dire as it was, has virtually no similarity to the murder of Milligan and gives rise to no inference, much less a reasonable probability, that the two acts were committed by the same person. McPherson contends that a sufficient similarity between the two acts is supplied by the fact that both were directed against a

person Parker believed to be an informant. The acts' other circumstances are utterly different, however; one involving a threat communicated from jail in a phone conversation and the other a murder committed after transporting the victim to a rural area. Moreover, the three years between the incidents is such a large time gap that we cannot say the trial court abused its discretion by deeming the probative value of the prior threat exceedingly slight and not enough to justify admission when weighed against its substantial potential to confuse or mislead the jury. The exclusion of this evidence, therefore, does not entitle McPherson to relief.

McPherson contends, finally, that notwithstanding the evidence rules, the exclusion of Parker's prior crime deprived him of his right to put on a complete defense. As he correctly notes, the United States Supreme Court has made clear that evidence rules are not to be applied so as to deprive a defendant of due process, *Montgomery v. Commonwealth,* 320 S.W.3d 28 (Ky.2010) (collecting cases), and in a criminal trial " 'due process is, in essence, the right to a fair opportunity to defend against the State's accusations.' " *Beaty v. Commonwealth,* 125 S.W.3d at 206 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). "An exclusion of evidence will almost invariably be declared unconstitutional," we have observed, "when it 'significantly undermine[s] fundamental elements of the defendant's defense.' " *Beaty,* 125 S.W.3d at 206–07 (quoting *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). We have many times reiterated, furthermore, "that a defendant 'has the right to introduce evidence that another person committed the offense with which he is charged.' " *Beaty,* 125 S.W.3d at 207 (quoting *Eldred v. Commonwealth,* 906 S.W.2d 694, 705 (Ky.1994)). That right does not, however, abrogate the rules

of evidence. Rather, the Supreme Court has held, the defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or disproportionate to the state's legitimate interest must the rule bow to the defendant's right. *Montgomery v. Commonwealth,* 320 S.W.3d at 41 (citing *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) and *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)).

In *Beaty,* for example, the defendant sought to mount an alternate perpetrator defense, but the trial court excluded his only evidence that the alleged alternate perpetrator had a motive—jealousy—for planting incriminating items in a car. Because, on the one hand, the evidence was crucial to the asserted defense, and, on the other, it was not cumulative and posed little risk of confusing the jury or requiring lengthy delving into collateral matters, the trial court abused its discretion, we held, by excluding it. We have upheld, however, the exclusion under the evidence rules of a defendant's evidence that was cumulative, only marginally relevant, or supportive of merely speculative defenses. *See, e.g., Montgomery,* 320 S.W.3d at 38–46 (cumulative and speculative evidence concerning alleged collateral sexual activity by sex abuse victim properly excluded under rape-shield provisions of KRE 412); *Davenport v. Commonwealth,* 177 S.W.3d 763 (Ky.2005) (evidence of witness's ordinary debts, such as car loan, not admissible as proof of motive for murder/theft where no other evidence suggested witness's involvement, and debt theory was thus speculative); *Maddox,* 955 S.W.2d at 720–22 (evidence that witness may have sexually abused one child properly excluded because it gave no more than specula-

tive support to inference that witness may have killed the victim and because it posed substantial risk of misleading the jury).

■ McPherson asserts that evidence of Parker's prior threat was crucial to his defense in that it lent telling weight to his theory that Parker had an independent motive for the crime—her rage against informants—other than the alleged offer of payment by Richard Smith. We reject that characterization of this evidence. As discussed above, Parker's verbal threat is only marginally relevant, if that, to her state of mind three years later with respect to Milligan. Exclusion of the prior threat evidence, moreover, did not leave McPherson's defense "in a shambles" as was the case in *Beaty*. Brandy Edmonds's testimony that Parker believed that Milligan "had a buy" on her enabled McPherson to argue cogently to the jury his independent motive theory. Admission of the prior crime evidence, finally, could easily have opened the door to questions and proof concerning the manner in which the threat was uttered, whether Parker was under the influence of intoxicants at the time, whether the recipient took the threat seriously, and other matters utterly collateral to this case. Given the very marginal relevance of this evidence, its cumulativeness, and its potential for distracting and confusing the jury, its exclusion did not amount to either an arbitrary or a disproportionate application of the relevance rules. The exclusion did not, therefore, violate McPherson's right to present a defense.

## II. The Trial Court Did Not Err By Excluding Evidence of Parker's Unrelated Statements to Police.

■ The analysis is much the same with respect to McPherson's next claim, which is that he was denied a full and fair opportunity to cross-examine Parker when he was not allowed to question her regarding other times she had testified or given statements against friends and acquaintances. McPherson contends that his inability to establish that Parker had a habit of "flipping" on people when she gets in trouble denied him his Sixth Amendment right to confront this key witness against him. We disagree.

During his cross-examination of Parker, McPherson's counsel asked her if she knew why Richard Smith may have referred to her as a "snitch." Parker replied that he could have been referring to a time when the police had accused her of trafficking and she had given them the names of people to whom she had sold drugs. She supplied, she said, "a lot of names." Counsel then asked if she had not also given a statement once, in another unrelated matter, against William Daniels, a former boyfriend. At that point the Commonwealth objected on relevance grounds to the question about Daniels and to questions about any other unrelated statement Parker may have given to the police. The trial court sustained the objection and later gave McPherson an opportunity to ask the disallowed questions by avowal. During the avowal, Parker admitted that while out with Daniels one night she had overdosed, had wound up in the hospital, and had said things to her mother which prompted her mother to contact the police. This incident apparently led to charges against Daniels and Parker had testified against Daniels at his trial. She also admitted that some time later she and a friend had both been arrested for writing bad checks and that each had "written out a statement" against the other.

McPherson asserts that the exclusion of this testimony denied him his right to fully cross-examine Parker. He is correct, as discussed above, that the evidence rules are not to be applied so as to prevent the defendant from making his case, including

exposing an adverse witness's bias against him or motive for testifying falsely. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We fail to see, however, how the excluded testimony reveals or even remotely suggests bias against McPherson or a motive for false testimony. Perhaps if Parker had a history of making false accusations when accusations were leveled at her, that history could be deemed relevant. We need not address that question, however, for there is no evidence here that Parker's "flipping" was dishonest, only that it was self-serving. On that score, Parker's plea bargain gave McPherson ample opportunity to attack her testimony as something concocted so as to minimize the consequences for herself. The excluded evidence would have served no purpose but to parade Parker's prior bad acts before the jury, contrary to KRE 402(irrelevant evidence is not admissible) and KRE 404 (character evidence is not admissible to prove action in conformity therewith). We are not persuaded that by disallowing that parade the trial court violated McPherson's constitutional rights.

### III. The Trial Court Did Not Err By Refusing to Give a Missing Evidence Instruction.

Finally with respect to Parker, McPherson contends that the trial court erred when it denied his request for a "missing evidence" jury instruction. The evidence he claims is missing are notes purportedly made by Detective Harrington, the St. Louis homicide detective who interviewed Parker not long after her arrest at the St. Louis bus station. It appears that before Parker entered her guilty plea she moved to have her statements to the police suppressed and that Detective Harrington testified at the suppression hearing. The detective made a recording of Parker's statement to him, and at the beginning of

the recording he apparently asked Parker to acknowledge that they had been talking and that she had agreed to make a statement. McPherson represents that at the suppression hearing the detective was asked about his interaction with Parker before he began the recording and whether he had made any notes. Harrington testified, according to McPherson, that he had made investigative notes, but then said that he had destroyed the notes, "about two da ...," at which point he stopped speaking, the court went off the record, and when the hearing resumed the detective merely said that, "the notes were destroyed." Apparently the prosecutor then explained to the court that the detective had made notes, but had destroyed them once they had been incorporated into his draft report, a report the prosecutor would provide to the defendant when it was complete.

During the instruction conference in this case, McPherson argued that Detective Harrington should be understood to have said that he destroyed his notes of Parker's pre-recording statements two days before he came to Kentucky to testify,; and from that testimony it could be inferred that the notes contained statements the detective wanted to cover up and which were inconsistent with Parker's recorded statements. From that, he maintained, it could be further inferred that the unrecorded statements in the destroyed notes exculpated him. The destruction of this favorable evidence, McPherson argued, violated his due process rights and entitled him to an instruction expressly authorizing the jury to infer from the destruction of the detective's notes their tendency to exonerate. Rejecting this argument, the trial court refused McPherson's tendered instruction. McPherson renews his argument here and contends that the

trial court erred by rejecting it. Again, we disagree.

■ In *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004), the Supreme Court summarized some of its holdings with respect to a defendant's due process right to have exculpatory evidence in the hands of the State disclosed or preserved:

> We have held [in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] that when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld. . . . [B]y contrast, we recognized [in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)] that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." . . . We concluded that the failure to preserve this "potentially useful evidence" does not violate due process *"unless a criminal defendant can show bad faith on the part of the police."*

540 U.S. at 547–48, 124 S.Ct. 1200 (citations omitted; emphasis in the original). In failure-to-preserve cases, the defendant must also be able to show both that the missing evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed" and that he was "unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Thus, to make out a due process violation where evidence has been destroyed, the defendant must show (1) that the State acted in bad faith in failing to preserve the evidence; (2) that the exculpatory potential of the evidence was apparent before its destruction; and (3) that the evidence was, to some extent, irreplaceable. The first two elements are interrelated. It must appear that the State deliberately sought to suppress material, potentially exculpatory evidence. Such was the case in *Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky.1988), where we held that the prosecutor's deliberate erasing of witness interview tapes so as to keep those statements away from the defense violated the Due Process Clause as well as the discovery rules and entitled the defendant to an instruction "permitting the jury to draw a favorable inference for the defendant from the destruction of the evidence." 754 S.W.2d at 540.

■ Here, by contrast, the detective's destruction of his preliminary notes once they had been incorporated in his draft report appears to have been more a matter of routine housekeeping than the suppression of evidence. Kentucky Rule of Criminal Procedure (RCr) 7.24, indeed, by making discoverable an officer's official report, but not his notes, seems to contemplate housekeeping of this very sort. *See also Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961) (FBI agents' destruction of notes from witness interviews upon preparation of investigatory report was not due process violation where the notes, having served their purpose, were destroyed by the agents "in good faith and in accord with their normal practice."). This is so even assuming that Detective Harrington destroyed his notes shortly before the suppression hearing.

It is also so even assuming that initially in her interview by Detective Harrington, before her recorded statement, Parker said things inconsistent with that later statement. She could have denied, for example, that she and McPherson were in-

volved in the murder. It is common, after all, for perpetrators initially to deny their crimes, or for their statements to evolve from a less incriminating version to a more incriminating one. Indeed, Parker admitted at trial that her statement evolved and that even her recorded statement to Detective Harrington was not the complete truth. We are not persuaded, however, that an initial but promptly abandoned denial or the fact that Parker's initial, unrecorded statement may have otherwise differed somewhat from her recorded one had such apparent exculpatory potential for McPherson, either as tending to exonerate him or to impeach Parker, that bad faith may be read into Detective Harrington's decision to discard notes that had served their purpose. Far more likely, on the contrary, is a good faith assumption by the detective that Parker's recorded statement was the one that mattered and his merely routine disposal of notes superseded by his report. McPherson's attempt to distill bad faith from these circumstances is utterly speculative and, as we have observed, jury instructions may not reflect merely speculative theories. *Brown v. Commonwealth,* 313 S.W.3d 577 (Ky.2010). The trial court did not err, therefore, by refusing McPherson's missing evidence instruction.

## IV. The Trial Court Did Not Err By Impaneling a Second Jury to Recommend a Sentence.

Finally, McPherson contends that he was illegally sentenced. After it found him guilty of murder, McPherson's March 2010 jury could not agree upon a sentence and was discharged. The trial court subsequently, in May 2010, impaneled a new jury and conducted a new penalty phase proceeding. This second jury recommended a sentence of life in prison. On May 12, 2010, the trial court entered a final judgment in accord with the decisions of both juries. McPherson contends that he should not have been subjected to the second jury proceeding and that instead, when the first jury could not agree, the trial court alone should have determined the penalty. We disagree.

■ McPherson relies on KRS 532.055, which in pertinent part provides as follows:

(1) In all felony cases, the jury in its initial verdict will make a determination of not guilty, guilty, guilty but mentally ill, or not guilty by virtue of insanity, and no more.

(2) Upon return of a verdict of guilty or guilty but mentally ill against a defendant, the court shall conduct a sentencing hearing before the jury, if such case was tried before a jury. In the hearing the jury will determine the punishment to be imposed within the range provided elsewhere by law. The jury shall recommend whether the sentences shall be served concurrently or consecutively. . . .

(4) In the event that the jury is unable to agree as to the sentence or any portion thereof and so reports to the judge, the judge shall impose the sentence within the range provided elsewhere by law.

We upheld this statute against a separation-of-powers challenge in *Commonwealth v. Reneer,* 734 S.W.2d 794 (Ky.1987). Although clearly an encroachment upon the judicial sphere, we explained, the statute is not contrary to any policy of this Court and can be embraced by way of comity. McPherson maintains that section (4), just quoted, applies straightforwardly to his case and entitles him to judicial sentencing.

If the penalty phase in this case had involved no more than the imposition of a sentence, we might agree. *See Holbrooks v. Commonwealth,* 85 S.W.3d 563 (Ky.

2002) (stating that where the original sentencing jury had deadlocked the trial court, instead of impaneling a new sentencing jury, should have proceeded in accord with KRS 532.055 and imposed a sentence). Here, however, the first jury found McPherson guilty of murder, a capital offense, and although the Commonwealth was not seeking the death penalty it was seeking an enhanced sentence— either life without parole or life without parole for twenty-five years. Such a sentence is authorized for a capital offense, KRS 532.030, but only if, in addition to the underlying crime, the jury finds, beyond a reasonable doubt, that the crime was committed under one of the aggravating circumstances listed in KRS 532.025(2). Here, the Commonwealth alleged that an enhanced sentence was justified because "[t]he offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit." KRS 532.025(2)(a)(4).

■ The United States Supreme Court has held that the facts necessary for the enhancement of a sentence, *i.e.*, the existence of aggravating facts or circumstances, must be found by a jury. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (discussing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in the context of capital sentencing).' Under our statutory scheme as well, in a capital case it is the sentencing jury that makes the aggravating-circumstance determination. KRS 532.025. Because additional jury fact-finding was thus required here before McPherson's sentence could be imposed,

the sentencing fell outside the dictates of KRS 532.055, which applies only when the jury has made all the requisite findings, but is unable to agree on a penalty.[2] McPherson, of course, could have moved, and in effect did move, to waive jury sentencing, but as the Commonwealth correctly points out, under our rules the waiver of jury sentencing requires the Commonwealth's consent, and here the Commonwealth objected. *Commonwealth v. Collins*, 933 S.W.2d 811 (Ky.1996) (discussing RCr 9.26). The trial court did not err, therefore, by submitting McPherson's sentencing to a second jury.

## CONCLUSION

In sum, McPherson was fairly tried and properly sentenced. His right to present a defense was not infringed by the exclusion of evidence that years before this crime Tamala Parker had told a supposed informant that he "was dead," since that threat had only marginal probative value, was not crucial to McPherson's claim that Parker had an independent motive for the killing in this case, and posed a significant risk of misleading the jury. Nor was his right to confront Parker infringed by the exclusion of evidence that she had in the past given statements to the police accusing others of minor crimes. Nothing about those statements suggested bias against McPherson or a motive for accusing him falsely. McPherson's request for a missing evidence instruction was properly denied, since his claim that exculpatory evidence might have been found in a detective's preliminary notes was purely speculative and raised no meaningful concern that the detective destroyed the notes in bad faith. McPherson's sentencing, final-

---

2. Even then it may be that KRS 532.055(4) does not extend to capital cases, but this case does not require us to reach that more general question. *But see Skaggs v. Commonwealth*, 694 S.W.2d 672, 681 (Ky.1985) (de-

cided before the enactment of KRS 532.055, but noting that "KRS 532.025(*l*)(b) clearly contemplates a jury recommendation in death penalty cases tried by a jury.").

ly, was properly submitted to a second jury after the first one could not reach a decision. Sentencing in this capital case required additional fact finding, and the need for that fact finding rendered KRS 532.055(4) inapplicable. We affirm, accordingly, the May 12, 2010 Judgment of the Muhlenberg Circuit Court.

All sitting. All concur.