# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 18, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0589-MR

FARAND SKINNER          APPELLANT

ON APPEAL FROM BRECKINRIDGE CIRCUIT COURT
V.        HONORABLE KENNETH HAROLD GOFF II, JUDGE
NO. 18-CR-00012

COMMONWEALTH OF KENTUCKY        APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A circuit court jury convicted Farand Skinner of the murder of Paul Harrison. Following the jury's recommendation, the trial court sentenced Skinner to twenty-three years' imprisonment. He now appeals the resulting judgment as a matter of right.[1]

Skinner claims several errors occurred during his trial: (1) that he should have received immunity from prosecution for acting in self-defense; (2) he was convicted on insufficient evidence; (3) prosecutorial misconduct deprived him of a fair trial; and (4) the trial court improperly admitted evidence. For reasons explained below, we find that no error occurred and affirm the judgment.

---

[1] Ky Const. § 110(2)(b) ("Appeals from a judgment of the Circuit Court imposing a sentence of . . . imprisonment for twenty years or more shall be taken directly to the Supreme Court.").

## I. FACTS

Farand Skinner, the victim, Paul Harrison, and the sole eyewitness, Timothy Day, were roommates. They had been friends for years, and Skinner allowed the other two men to stay at his home. According to Day, Skinner and Harrison frequently argued, and Skinner made Harrison move out.

Harrison's moving out ignited an exchange of contentious text messages between Harrison and Skinner about when Harrison could retrieve his belongings from Skinner's house. Harrison texted that he was "going to take things to the extreme," "get physical," "knock his teeth down his throat" and that Skinner was going to have to "end up killing him," he was "ready to die," and "im bring aload of my shit out shoot me or do whatever but I'm going to get my shit."

Day accompanied Harrison to Skinner's house to help him move his belongings. How the events unfolded upon their arrival is disputed. Skinner's residence was equipped with a home-surveillance camera, and footage from that camera—despite low-quality video and no audio—shows Skinner emerging from the house as Harrison and Day arrive, Harrison exiting the vehicle and approaching Skinner, Skinner shooting Harrison once, and Harrison collapsing briefly before retreating to the vehicle. Once Harrison was inside the vehicle, Skinner shot at least twice into the vehicle, killing Harrison.

Skinner's defense at trial was self-defense. He claimed that Harrison got out of the car, threatened to kill him, approached him aggressively with a knife, and in a manner that made Skinner fear for his life.

Day did not testify that Harrison threatened to kill Skinner. He could only testify that Harrison was angry and the two argued immediately upon arrival. But in Day's initial interview with police, he indicated that Harrison may have threatened Skinner.

After the shooting, Skinner reentered the house and called 911. He identified himself, his address, and reported that he had shot Harrison. The grand jury indicted Skinner for Harrison's murder.

## II. ANALYSIS

### A. The trial court did not err in denying Skinner's motion to dismiss the indictment under Kentucky Revised Statute (KRS) 503.085.

Skinner argues the Commonwealth improperly prosecuted him because he killed Harrison in self-defense; therefore, he was entitled to immunity from prosecution under Kentucky Revised Statute (KRS) 503.085. Ordinarily, we do not "revisit whether there was probable cause" in cases in which "a jury has already convicted the defendant—and, thus, found [his actions were] unlawful beyond a reasonable doubt" unless there are flaws in the conviction.[2] But considering the seriousness of the alleged errors and fact-intensive issues raised by Skinner, we will review the trial court's denial of his immunity motion.[3]

---

[2] *Ragland v. Commonwealth*, 476 S.W.3d 236, 246 (Ky. 2015) ("In the present case, Truss 'has indeed shown his conviction to be flawed due to the . . . errors discussed above.' Therefore, we must 'address the merits of his immunity claim, which would preclude the prosecution from going forward on remand were this Court to find error in the trial court's denial of immunity.").

[3] *Id.*

3

A trial court must deny a motion to dismiss criminal charges based on the accused's claim of immunity if a substantial basis supports a finding of probable cause to conclude that the force used by the accused was unlawful.[4] And we will uphold the trial court's decision to deny immunity so long as a substantial basis supported its finding that probable cause existed that the accused used unjustifiable force. A finding of probable cause requires that there be reasonable grounds to support a belief of unjustified force, supported by less than prima facie proof, but more than a mere suspicion.[5]

Our precedent, *Lemons v. Commonwealth*, is instructive.[6] In *Lemons*, we upheld a trial court's decision to deny immunity because a substantial basis supported its conclusion of probable cause the defendant acted with unreasonable force.[7]

In *Lemons*, the trial court found probable cause to believe the defendant did not act in self-defense because there were inconsistent versions of events from eyewitness testimony and inaccuracies in the timeline of events.[8] So we held that the totality of the circumstances justified a reasonable belief that the defendant injured the victim and supported the trial judge's finding that there

---

[4] *Rodgers v. Commonwealth*, 285 S.W.3d 740, 754 (Ky. 2009).

[5] *Id.* at 715.

[6] 437 S.W.3d 708 (Ky. 2014).

[7] *Id.* at 716.

[8] *Id.* at 715–716.

4

was probable cause to believe that the defendant had acted with unjustifiable force.[9]

As in *Lemons*, we find the trial court in the present case did not err in finding probable cause that Skinner's use of deadly force was unjustified. The trial court's finding was supported by a substantial basis found in inconsistent evidence and testimony. For example, while Skinner argues that Harrison approached him aggressively with a knife, the sole eyewitness, Day, did not recall seeing a knife and did not describe Harrison's approach to the house as exhibiting behavior that justified the use of deadly force against him. Additionally, the video footage of the crime is inconclusive, at best, of the manner Harrison approached Skinner. These two facts comprise much of the evidence against Skinner.

Skinner argues that the trial court erred because there are no differing versions of events. Though Skinner's testimony is similar to Day's eyewitness testimony in many respects, it differs in the aspect most critical to Skinner's claim of immunity, which is whether Harrison approached with a deadly weapon and in a threatening manner making him fear for his life. This critical variance in the testimony is a small detail that has a great effect on whether Skinner acted justifiably. The trial court did not err in finding probable cause existed to believe Skinner did not have adequate reason to use deadly force.

Accordingly, the trial court properly denied Skinner's motion to dismiss the indictment based on immunity.

**B. The trial court properly denied Skinner's motion for directed verdict of acquittal and his new trial motion because there was sufficient evidence to support the jury's verdict.**

Skinner argues the trial court erred when it denied his motion for a directed verdict of self-defense. We review a trial court's denial of a directed verdict motion de novo, and we will uphold the trial court's decision unless it was clearly unreasonable for a jury to find guilt.[10] In ruling on a directed verdict motion, a trial court draws all fair and reasonable inferences in favor of the Commonwealth, assumes all its evidence to be true, reserves weight and credibility determinations for the jury, and must deny the motion so long as there is sufficient evidence to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty.[11]

A directed verdict motion for self-defense should only be granted in the rarest of circumstances and requires there to be no contradicting evidence, fact, or circumstance that the jury could reasonably conclude that some element of self-defense was lacking.[12] Clearly, the defendant has a high burden before a directed verdict for self-defense will be granted. We review this claim of error accordingly.

---

[10] *Benham v. Commonwealth*, 816 S.W.2d 186, 187 (Ky. 1991).

[11]*Id.*

[12] *West v. Commonwealth*, 780 S.W.2d 600, 601 (Ky. 1989) (relying on *Townsend v. Commonwealth*, 474 S.W.2d 352 (Ky. 1971).)

We find sufficient evidence for a reasonable jury to conclude that Skinner was not acting in self-defense, and the trial court properly denied his motion. At trial, the Commonwealth relied heavily on the surveillance video of the incident taken from Skinner's residence. Though blurry, the video showed the victim approaching Skinner, Skinner shooting a gun, the victim collapsing, the victim then retreating to his vehicle, and Skinner shooting twice more into the vehicle. The video, however, is not clear enough to prove that the victim was approaching Skinner in a manner that would lead him reasonably to believe he was acting in fear of imminent bodily danger.

Additionally, Skinner contends that the victim was approaching him not only aggressively, but with a knife. But the quality of the video footage is too poor to prove that claim. Overall, the lighting on the footage is dim, the images are fuzzy, and the video only shows each person's movements but not the details of bodily features. If, as Skinner contends, the victim had a knife and approached him in an aggressive manner, the video was not clear enough to show it. A reasonable juror could find that the victim was not holding a knife, was not approaching aggressively, and that Skinner was not acting in self-defense.

As previously mentioned, the testimony of the sole eyewitness, Day, does not completely support Skinner's defense. Day testified that the two men had been arguing, fought regularly, but he did not know Harrison customarily to carry a weapon. Importantly, he did not testify that Harrison approached Skinner with a knife or with any weapon. Day's testimony does support

7

Skinner's defense in some regards, but not enough to overcome the steep burden of a directed verdict for self-defense. The evidence presented was sufficient to allow a reasonable jury to consider whether Skinner's use of deadly force was unjustified. The trial court did not abuse its discretion in denying Skinner's motion for directed verdict.

## C. Prosecutorial misconduct did not deprive Skinner of a fair trial.

Skinner agues misconduct by the Commonwealth resulted in a *Brady*[13] violation that deprived Skinner of a fair trial. According to Skinner, the Commonwealth deprived him of exculpatory evidence, the police disposed of the exculpatory evidence, Detective Borders gave false testimony, and the Commonwealth elicited false testimony. This Court reviews claims of prosecutorial misconduct by focusing on the overall fairness of the trial and will only reverse the conviction if it finds the misconduct to be so improper, prejudicial, and egregious as to have undermined the overall fairness of trial.[14] We find after reviewing all the circumstances that Skinner received a fair trial.

### 1. The Commonwealth did not fail to disclose material evidence to the defense.

Prosecutorial misconduct in the discovery process of a criminal trial can result in a violation of the defendant's due-process rights.[15] A *Brady* violation occurs when the Commonwealth suppresses evidence that is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

---

[13] *Brady v. Maryland*, 373 U.S. 83 (1963).

[14] *Brewer v. Commonwealth*, 206 S.W.3d 343 (Ky. 2006).

[15] *Id.*

prosecution.[16]  A *Brady* violation also results when the government possesses integral information the defense does not and deprives the defendant of a fair trial.[17]  But, a *Brady* violation does not occur when the defense is aware of the allegedly suppressed information.[18]

Here, the Commonwealth did not improperly keep exculpatory evidence from Skinner.  Most of the alleged misconduct by the Commonwealth relates to the existence of a utility knife found on Harrison's body.  This knife was not found at the scene of the crime but was discovered later by the medical examiner during the autopsy.  Four days after the incident occurred, Harrison's personal effects were returned to his family, including the knife.  After the personal items were released, the Commonwealth turned over the remaining evidence of the knife's existence during discovery.

Although the knife itself was missing, which is an issue that will be discussed shortly, the defense had the autopsy report listing a utility knife as an item found on Harrison's body along with pictures of the knife's sheath that held it.  The defense was aware the knife had been on Harrison's person when he died, what the knife's sheath looked like, and that it had been given back to the family.  This information was properly disclosed to Skinner during the discovery process.  Skinner was able to cross-examine Detective Borders about the knife and to raise doubt about the thoroughness of the Commonwealth's

---

[16] *Commonwealth v. Parrish,* S.W.3d 694, 697 (Ky. 2015).

[17] *Id*. at 698.

[18] *Id.*

investigation. As previously mentioned, *Brady* concerns those instances in which the government possesses information that the defense does not have and then fails to disclose that information.[19] Here, because there was no information withheld from the defense, no *Brady* violation occurred. Therefore, if prosecutorial misconduct occurred in Skinner's case, it was not a result of the Commonwealth's failure to disclose exculpatory evidence or information regarding it.

### 2. The trial court's finding that the Commonwealth did not act in bad faith by failing to preserve potentially exculpatory evidence was supported by substantial evidence.

Skinner argues his conviction must be reversed because the Commonwealth's failure to preserve evidence deprived him of a fair trial. We review a trial court's ruling on a failure to preserve evidence issue for clear error and we will uphold the finding so long as it is supported by substantial evidence.[20] To prove a failure to preserve evidence, the defendant must show the Commonwealth destroyed potentially useful evidence in bad faith.[21] Deliberate conduct may result in a finding of bad faith, but mere negligence on

---

[19] *Bowling v. Commonwealth*, 80 S.W.3d 405, 410 (Ky. 2002) ("Rather, *Brady* concerns those cases in which the government possesses information that the defense does not and the government's failure to disclose the information deprives the defendant of a fair trial.").

[20] *Garland*, 458 S.W.3d 781, 786 ("Substantial evidence is evidence, when taken alone or in light of all the evidence, which has sufficient probative value to induce conviction in the mind of a reasonable person.").

[21] *Id.* at 786–87 ("Garland fails, however, to satisfy the first and most crucial prong of the *McPherson* test: bad faith on the part of the government.").

10

the part of the Commonwealth generally does not.[22]  If bad faith is shown, the potential prejudice can be cured with a missing-evidence instruction.[23]

Four days after the shooting, Detective Borders returned the victim's inventoried belongings to his family.  This included the utility knife that Skinner alleges the victim was holding as he approached and supports his claim that he was acting in self-defense.  Skinner argues this was misconduct and constituted a violation of his due-process rights.  The trial court found there was no misconduct by the Commonwealth because Detective Borders did not act in bad faith.  The trial court gave a missing-evidence instruction nevertheless.

*Sanborn v. Commonwealth*[24] draws the clearest picture of bad-faith conduct in a failure to preserve evidence by the Commonwealth.  In *Sanborn*, we held that a defendant's due-process and discovery rights were violated when the prosecutor deliberately erased witness-interview tapes to keep defense counsel from obtaining the statements contained in them.[25]

By contrast, in *Garland v. Commonwealth*,[26] we upheld a trial court's finding that the Commonwealth had not acted in bad faith when two officers destroyed fingernail clippings in accordance with KSP procedure.  The

---

[22] *Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky. 1997).

[23] *Gonclaves v. Commonwealth*, 404 S.W.3d 180, 197.

[24] 754 S.W.2d 534, 539–40 (Ky. 1988).

[25] *Id*. at 539.

[26] 458 S.W.3d 781 (Ky. 2015).

11

exculpatory nature of the evidence was not discovered before trial, but after.[27] That was substantial evidence that the officers were not acting in bad faith.[28]

Similarly, in *McPherson v. Commonwealth*,[29] we upheld a trial court's decision to find the Commonwealth did not act in bad faith when a detective destroyed his preliminary notes once they had been incorporated into a draft of his report. As in *Garland*, we found this to be more a matter of routine housekeeping than the suppression of evidence.

We find the trial court in the present case did not err in finding there was no bad faith by the Commonwealth because there was a substantial basis for finding that Detective Borders returned the knife to victim's family out of negligence, and not deliberate misconduct. Skinner offered no evidence that Borders intentionally gave the knife to Harrison's family to deprive Skinner of its use in his defense but only speculates that the detective knew that the utility knife was a deadly weapon that would provide credibility to his defense.

Detective Borders testified that he did not check the victim's belongings before returning them to the family and that he personally did not think the knife to be a deadly weapon, but rather an ordinary pocketknife. Also, Borders's testimony regarding the crime scene indicated that the knife was not found immediately upon viewing the victim's body but was found later by the medical examiner, sheathed and in Harrison's pocket. Additionally, the

---

[27] *Id.* at 786.

[28] *Id.*

[29] 360 S.W.3d 207, 217 (Ky. 2012).

Commonwealth contends that Detective Borders did not consider the knife critical to Skinner's defense because within the four days between the crime and the release of the belongings, Skinner had not mentioned that the victim brandished a knife but only that he was acting in self-defense because of the way the victim approached him. This fact further supported the trial court's conclusion that Borders negligently disposed of the knife because he was unaware of its potential as exculpatory evidence.

Evidence of bad faith must go beyond mere speculation.[30] We are unwilling to say the trial court erred by concluding that the Commonwealth did not intentionally deprive Skinner of potentially exculpatory evidence. Returning personal effects to the family is a common police procedure. And, as the trial court found it was negligent for Detective Borders to not check the victim's belongings before returning them. But we cannot say this approaches the intentional conduct we found in *Sanborn.* The knife lends some support to Skinner's claim of self-defense, but the trial court did not clearly err by finding that Detective Borders did not act in bad faith because substantial evidence supported the conclusion it was a result of negligence.

Importantly, the trial court gave the jury a missing-evidence instruction despite not finding bad faith. The missing-evidence instruction allowed the jury to infer the absent item would be favorable to the defendant's case.[31] While it is impossible to gauge the effect of exhibiting the knife would have had

---

[30] *McPherson,* 360 S.W.3d at 217–18.

[31] *Swan v. Commonwealth,* 384 S.W.3d 377, 391 (Ky. 2012).

on the success of Skinner's claim of self-defense, it cannot be said that he was denied a fair trial because of its absence.

### 3. Detective Borders did not give false testimony.

Skinner's third claim of prosecutorial misconduct arises from Detective Borders's testimony. Detective Borders testified at the preliminary hearing, before the grand jury, and at trial. At the preliminary hearing, he testified that the victim did not appear to be armed at the scene.[32] Before the grand jury, he testified that Skinner made two statements to police: (1) that he did not know Harrison to carry a weapon and (2) that he did not believe the victim to be armed at the time. Additionally, before the grand jury, Detective Borders stated that the victim did not possess a weapon and Skinner would have never seen a gun. Borders testified to the same facts at trial that he relayed to the grand jury.

### a. Borders's Grand Jury Testimony

Skinner argues that Detective Borders's grand jury testimony was false because the medical examiner found the knife on Harrison's body. Skinner's argument centers around the following statement made by Detective Borders to the grand jury:

> Commonwealth: You didn't find any weapon in the car of the victim or on the person of the victim or anything like that?

> Borders: He did not possess any weapon on him. In the vehicle, in the rear of the vehicle, there was an air rifle but that was not apparent. That had to be . . . we had to find that when we searched the vehicle.

---

[32] The defense does not take issue with Det. Borders's preliminary hearing testimony.

In analyzing claims of false testimony, the Court must analyze three factors: (1) Was the testimony false?; (2) If the testimony was false, was it material?; and (3) Did the prosecution know it was false?[33]  If the Court answers these three questions in the affirmative, the conviction must be reversed.[34]  In *Commonwealth v. Baker,* the Court of Appeals stated, "Generally, a defendant must demonstrate a flagrant abuse of the grand jury process that resulted in both actual prejudice and deprived the grand jury of autonomous and unbiased judgment."[35]

We find Detective Borders's grand jury testimony not falsified because his testimony relayed what he thought at that time to be true.  Borders did not see a weapon on the victim at the crime scene.  Additionally, in Skinner's initial statements to police he did not say that the victim approached him with a knife.  Instead, Skinner said he had to defend himself because of the way that the victim approached him, the look in his eyes, and the way the victim raised his hands.  Additionally, when asked if he thought Harrison had anything in his hands, he shook his head and said "I . . . I don't know."[36]  Borders testified that the victim did not have a weapon on his person when they removed him from the car.[37]  This is true testimony because Detective Borders himself did

---

[33] *Commonwealth v. Baker,* 11 S.W.3d 585, 590–91 (Ky. App. 2000).

[34] *Id.*

[35] *Id.* at 588.

[36] VR: 8/14/19 1:43:11; 2:19:54.

[37] Skinner does not contend that Harrison had an air rifle.  The air rifle was found at the scene during the search of the vehicle, not when the body was removed.

not find a knife on the victim, even though a knife was later found during the autopsy.

While the testimony presented to the jury is arguably misleading, it cannot be said to be false, and the Commonwealth is under no duty to present exculpatory evidence to the grand jury. As we have held, if the Commonwealth's duty was to "present exculpatory as well as inculpatory evidence" it "would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."[38] Furthermore, a grand jury proceeding requires only a finding that the evidence supports an indictment for the crimes charged.[39] If the grand jury had been told that a knife was found later in the victim's belongings, it is hard to say this would have changed their decision to charge Skinner. The fact the grand jury did not hear that a knife was later found on the victim was likely immaterial.

### b. *Borders's trial testimony was not false.*

As previously discussed, to establish prosecutorial misconduct the defendant must show (1) the statement was false; (2) the statement was

---

Borders's grand jury testimony relays this fact. At trial, when Borders was specifically asked if any weapons were found on Harrison when they removed him from the vehicle, he stated "Certainly no firearms and I don't believe there were any weapons of any type."; VR 8/13/19 11:23:20.

[38] *Baker*, 11 S.W.3d at 591 (quoting *United States v. Williams*, 504 U.S. 36, 51, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352 (1992)).

[39] *Rice v. Commonwealth*, 387 S.W.2d 4, 5 (Ky. 1965) ("The grand jury proceeding is not a trial. Such a body does nothing more than accuse a person of the offense he is alleged to have committed. The grand jury is merely required to find an indictment where they have received what they believe to be sufficient competent evidence to support it."); Kentucky Rules of Criminal Procedure 5.10.

16

material; and (3) the prosecution knew it was false.[40]  If there is a reasonable likelihood that perjured testimony affected the judgment of the jury, then the defendant's due process rights have been violated and a new trial must be ordered.[41]

Detective Borders testified at trial that he did not find a knife on the victim's body.  When asked if any weapons were found on Harrison's body at the scene of the crime, Borders stated: "There were certainly no firearms and I don't believe there were any weapons of any type."[42]  The prosecution then asked him to read the list of items returned to Harrison's family that revealed the knife listed as one of his personal effects found during the autopsy.  This fact was also disclosed during the medical examiner's testimony as was a photograph of the sheath containing the knife.

The defense argues that Borders's testimony about not finding a knife was false because it was found during the autopsy.  Additionally, the defense argues that the Commonwealth elicited false testimony.  As discussed previously, Detective Borders's testimony was not false because he himself did not observe the knife at the scene.  While the fact the knife was found during the autopsy was never revealed to the grand jury, at trial, immediately after

---

[40] *Commonwealth v. Spaulding*, 991 S.W.2d 651, 654 (Ky. 1999) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

[41] *Id.* at 655–66 ("When [such] perjured testimony could 'in any reasonable likelihood have affected the judgment of the jury,' the knowing use by the prosecutor of perjured testimony results in a denial of due process under the Fourteenth Amendment and a new trial is required." (quoting *Giglio v. United States*, 405 U.S. 150, 153, (1972)).

[42] VR: 8/13/19 11:23:10.

Detective Borders answered that he did not find the knife, the Commonwealth drew Borders's attention to the list of items contained in the medical examiner's report, which disclosed that the victim did have the knife in his possession when he died. Additionally, the picture of the knife sheath was shown during the medical examiner's testimony. The defense was aware of the knife, used the presence of the knife to aid its defense of self-defense, and no false testimony was presented that compromised Skinner's right to a fair trial.

### D. The surveillance video and 911 call recording were properly authenticated.

We review preserved trial errors for abuse of discretion and will uphold the trial court's ruling unless unreasonable, arbitrary, or unsupported by law.[43] Under KRE 901, evidence is properly authenticated when the proponent offers enough proof for a reasonable jury to conclude the item is what it is proposed to be.[44] The burden lies with the proponent and must provide prima facie evidence of authentication.

In *Litton v. Commonwealth*,[45] we found surveillance photographs to be properly authenticated when the store owner identified the photos as fair and accurate representation of the location, explained how the cameras operated, and testified that the store owner had removed the film, sent it to the installer, and received the pictures from it.[46]

---

[43] *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004).

[44] Kentucky Rule of Evidence 901.

[45] 597 S.W.2d 616, 618–620 (Ky. 1980).

[46] *Id.* at 619–20.

### 1. *The surveillance video was properly authenticated.*

As in *Litton*, we find the Commonwealth provided sufficient evidence to authenticate the video as a recording of the alleged offense. Skinner argues that the Commonwealth's authentication was insufficient because the mechanical workings of the camera were explained at trial. But Detective Borders testified that he saw the cameras as he patrolled the scene, found the control unit for the camera inside Skinner's house, and made a copy of the video from the control unit. This was sufficient to allow the jury to find the video was what it was purported to be. So the trial court did not err in finding the video properly authenticated.

Additionally, Skinner does not contest the accuracy of the video footage. In *Litton* the defendant also did not argue the photos were fake, and we stated, "In the absence of a showing of irregularity in the production of a proffered photograph, we need not set up 'unrealistic roadblocks'" and "deprive the trier of the facts of evidence not subject to the foibles of the imperfect memories and the passions and prejudices of human witnesses."[47] Here, Skinner only contests that Detective Borders did not testify to facts like the camera's recording capabilities and technical workings. While these are facts relevant to authenticating the video, in this instance, these specific questions would have only provided additional evidence of authentication and the credibility and weight the jury should give to the video. Further, while Detective Borders's

---

[47] *Litton*, 597 S.W.2d at 620 (quoting *United States v. Hobbs*, 403 F.2d 977, 978–79 (6th Cir. 1968)).

19

testimony provided prima facie evidence of authentication, the jury also viewed Skinner's post-arrest interview in which he stated his surveillance camera had a 30-day recording span and that it was accessible with a computer mouse and remote. In sum, Detective Borders's testimony provided the jury with enough information reasonably to conclude the video was what it was purported to be.

### 2. *The recording of the 911 call was properly authenticated.*

Skinner argues the Commonwealth failed to provide prima facie evidence of the authenticity of his 911 call following the altercation. We review preserved trial court evidence rulings for abuse of discretion and will affirm the ruling unless it is arbitrary, unreasonable, or unsupported by law.[48] Like the surveillance video, we find the recording of Skinner's 911 call was properly authenticated under KRE 901.

The Commonwealth authenticated the call through the testimony of a 911 dispatcher. The dispatcher explained how 911 calls are maintained and how they are kept in their regular course of business. She testified how the calls were stored in the archives, how she retrieved the recording from the archives, and how she identified the call based on the name, address, or the computer-aided dispatch (CAD) report number. Further, she explained that she found the call and made a copy of it to a CD after listening to it and verified the CD was a copy of the call. This testimony authenticated the phone call, as

---

[48] *Johnson,* 134 S.W.3d at 566.

20

it provides prima facie evidence that this is the call Skinner made to 911 the night of the incident.

Additionally, while Skinner does not argue the recording is false, it should be noted that additional credibility and authentication were provided by the statements contained in the phone call itself.[49] The dispatcher asks the caller to identify himself, to give his phone number and address. The caller identifies himself as "Farand Owen Skinner III" and recites his phone number and address. The jury would have been able to compare the voice on the recording to Skinner's voice in his interview tape and his voice at trial. This provided additional assurance that the 911 recording offered at trial was the phone call Skinner made to police following the incident.

### III. CONCLUSION

For the reasons explained above, we affirm the judgment.

All sitting. All concur.

---

[49] Kentucky Rule of Evidence 901(b)(5) "("Voice identification." Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.)."

COUNSEL FOR APPELLANT:

David Bradley Mour
Law Office of David B. Mour

Gregory Dean Simms
Murphy & Associates


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Jesse Leo Robbins
Assistant Attorney General