# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: AUGUST 22, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0005-MR

LEROY LOVE          APPELLANT

ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.          HONORABLE THOMAS D. WINGATE, JUDGE
NO. 18-CR-00264-001

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Franklin County jury convicted Leroy Love of two counts of manslaughter in the second degree and two counts of robbery in the first degree. The Franklin Circuit Court sentenced Love to 60 years of imprisonment. This appeal follows as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Franklin Circuit Court.

## I. FACTS AND BACKGROUND

Two men, Jared Moore and Dustin Johnson, were shot and killed during an in-home robbery at 302 Alexander Street in Frankfort, Kentucky, the evening of June 26, 2018. A third occupant of the house, Morgan Crutchfield, survived the robbery. Shortly thereafter, Juanita Durrum would become one of the subjects of a police investigation into the Alexander Street robbery. Juanita

admitted to police that she had participated in the Alexander Street robbery alongside Rakiethieus Wesley, Bricelyn Leake, and Leroy Love. Juanita maintained, however, that it was Love who had shot and killed the victims of the robbery. Juanita also accused the surviving victim, Crutchfield, of conspiring with Love to orchestrate the robbery in order to share in its spoils. Love was arrested and charged with two counts of murder and two counts of robbery in the first degree. Juanita, Rakiethieus, Bricelyn, and Crutchfield were each also charged with crimes stemming from the Alexander Street robbery.

Juanita, however, later recanted her statements to police regarding Crutchfield's involvement in the crime, and he was released from incarceration in June 2019. Rakiethieus, Bricelyn, and Juanita would plead guilty to various charges. Love proceeded to trial, which spanned six days.

At trial, Love took the stand in his own defense and testified that he travelled to Kentucky from his home in Wisconsin to be with Shameeka Taylor, in June 2018. Taylor and Love were in a relationship, and Love stayed at the Clay Villa Apartments in Frankfort where Taylor lived. Taylor had been in a prior relationship with Rakiethieus, and the two shared children. Love had previously known Rakiethieus from Wisconsin, and testified that the two did not have bad blood despite his relationship with Taylor. In June 2018, Rakiethieus was in a relationship with Juanita. Love would occasionally stay with Rakiethieus and Juanita in Lawrenceburg, Kentucky. Bricelyn, as well as his older brother Dusean Leake, also stayed with Rakiethieus and Juanita in

2

Lawrenceburg. However, Love did not meet Bricelyn or Dusean until he travelled to Kentucky.

At Love's trial, Juanita testified that she had known Love for less than two months before the Alexander Street robbery. Juanita testified that Love was connected to their group through their shared criminal activity. Specifically, Juanita testified that Love had been involved in two Frankfort robberies with the group leading up to the Alexander Street robbery—one at the Triple R Mart gas station and the other at a Papa John's restaurant. After the group robbed the Papa John's restaurant, they went to a Taco Bell. When asked to examine still photos from surveillance footage of the Taco Bell, Juanita testified that Love was wearing a black shirt and black and white plaid shorts. At trial, Rakiethieus corroborated Love's involvement in the Papa John's robbery. Rakiethieus also testified that Love had changed into the black shirt and black and white shorts after the Papa John's robbery. Love, however, denied any involvement in the Papa John's robbery.

Juanita testified that the group carried out the Papa John's robbery to get enough money to buy a gun they intended to use during the Alexander Street robbery. Juanita testified that the day after the Papa John's robbery, on June 26, 2018, she went to a pawn shop in Frankfort with Rakiethieus, Bricelyn, and Love to buy a gun. Juanita testified that she was the one who purchased the gun, but had to wait to retrieve it from the pawn shop until her background check had been completed. Juanita testified that Love took possession of the gun after they picked it up from the pawn shop.

Juanita testified that Dusean then met the group in Frankfort to scout out the house on Alexander Street they intended to rob. Juanita testified that Dusean later declined to participate in the Alexander Street robbery, although he had some participation in its planning. Dusean testified that he was unaware the group intended to rob the occupants of 302 Alexander Street, but did admit to showing the others where that house was located. Juanita testified that Dusean had previously purchased marijuana from someone at 302 Alexander Street. Dusean denied any participation in the Alexander Street robbery. Both Rakiethieus and Bricelyn testified that Dusean was not at 302 Alexander Street during the robbery.

Juanita testified that she, Love, Rakiethieus, and Bricelyn were the four members of the group that ultimately participated in the Alexander Street robbery. Juanita also testified that Bricelyn and Rakiethieus were armed with BB guns, she carried a pocket knife, and Love was armed with the handgun she had just purchased from the pawn shop. According to Juanita, Rakiethieus and Love entered the residence first, followed shortly thereafter by her and Bricelyn. Juanita testified that when she entered the house, Love and Rakiethieus had already ordered all three occupants of the house onto the ground. Bricelyn confirmed the order in which the group entered the house, but testified that he was unaware that Love intended to rob the occupants of the house. Bricelyn also testified that he heard Love ask the occupants of the house to tell him "where it's at." Juanita testified she and Bricelyn searched the home for marijuana and money, and that they discovered roughly four

4

ounces of marijuana and less than $200 in cash. Juanita testified that the group also stole televisions and a gaming system from the home.

As the group prepared to leave the home through the front door, Juanita testified that Love told her, "There was still something to take care of. They had already seen us." According to Juanita, that was when the shooting started. Rakiethieus testified that Love shot all three of the victims of the Alexander Street robbery. After the shots were fired, Juanita testified that she thought all three victims had been killed. Juanita testified that she, Rakiethieus, and Bricelyn left the scene of the shooting in her car, an SUV, while Love left the scene in one of the victims' cars, a Toyota Camry.

Love called the surviving victim of the Alexander Street robbery, Morgan Crutchfield, to testify during his defense. Crutchfield testified that two men initially entered the home during the Alexander Street robbery—one was larger and did not have short hair and the other was tall, skinny, and had short hair. Crutchfield testified that both men appeared to have pistols and that he was hit in the head with a pistol during the robbery. Crutchfield testified that after the shooting had subsided, he went outside to get help and saw one of the victims' cars driving away from 302 Alexander Street. Crutchfield testified that there was no doubt in his mind that whoever was in that car was the shooter.

Regina Harp, who lived across the street from 302 Alexander Street, testified that, from her kitchen window, she saw a blue SUV arrive at 302 Alexander Street on the evening of June 26, 2018. Harp testified that she saw multiple people exit that SUV and go into the house, including one man

wearing a hoodie and black and white patterned shorts. Harp testified that she did hear a "pop" around the same time, but that was not unusual for the neighborhood. Harp testified that she went back to her kitchen window 30 minutes later and saw the same group of individuals getting into their blue SUV. Harp testified, however, that the individual in the black and white shorts got into a black car. Harp testified that both cars drove away.

According to Juanita, the group met at a gas station on East Main Street immediately after the Alexander Street robbery. The Commonwealth introduced still photos from the gas station security camera, and Juanita identified someone exiting the Toyota Camry as wearing black and white plaid shorts. Juanita testified that the group then drove both cars to Capitol View Park where they met Dusean. Dusean testified that when the group arrived at Capitol View Park, Love told him they had killed three people in the course of the robbery. Dusean testified that Juanita told him the victims had to die because they had seen their faces. Dusean also testified that Love told him that he shot the victims, and that he showed him how he shot the victims.

According to Juanita, the group searched through the stolen Toyota Camry at Capitol View Park and found a revolver in the car. Juanita and Rakiethieus each testified that Love kept the revolver. After searching through the Toyota Camry, Juanita testified that the group left the car at Capitol View Park and returned to Lawrenceburg in Juanita's SUV. According to Juanita, she later learned, via news reports, that one victim had survived the Alexander Street robbery. Juanita also testified that she and Rakiethieus later put the

6

murder weapon from the Alexander Street robbery, as well as the group's BB guns, into a plastic bag filled with gravel and sank them in Taylorsville Lake. According to Frankfort Police Department Detective Josh Baker, the lead detective on this case, officials later recovered a bag including two BB guns and a 9mm handgun from Taylorsville Lake. Police also recovered a revolver that was concealed behind a stairwell at the Clay Villa Apartment Complex in Frankfort, according to Frankfort Police Department Detective Arthur Stratton.

Phyllis Hay, who lived next door to 302 Alexander Street, testified that someone came to her front door the evening of June 26, 2018, and asked to borrow her phone to call 911. Hay testified that the man went "berserk" at one point, and told her that there had been a shooting next door. Joshua Brown, an officer of the Frankfort Police Department, testified that he responded to the scene of the Alexander Street robbery and observed two victims on the ground—one who appeared to still be alive and another who appeared to be dead. Detective Baker testified that he did not know of any blood splatter evidence that was collected from the scene of the robbery. Detective Baker also testified that, to his knowledge, the crime scene was not dusted for fingerprints. Detective Baker did testify, however, that bullet fragments were recovered from the scene of the crime, as well as from the bodies of the victims. Those fragments underwent ballistics testing. Detective Baker also testified that shell casings were recovered from the scene and underwent ballistics testing. Detective Baker also testified that a Coke can was collected from the crime scene, but was not the subject of further testing. According to Detective

7

Baker, multiple cell phones belonging to Dusean, Bricelyn, Love, and Juanita all underwent data extraction. Tom Bell, an expert in digital forensic analysis, testified as to his analysis of some of this cell phone data.

As previously stated, Love took the stand and testified in his own defense. Love gave the jury an alternative version of the events leading up to Alexander Street robbery. Love testified that he woke up at Juanita's home in Lawrenceburg on the day of the Alexander Street robbery. Love testified that the group discussed buying a gun that day in Frankfort because they needed "protection." Love testified that he went to a pawn shop with the group where Juanita bought a handgun. Love testified that the group then went back to Juanita's home and waited until they were able to pick up the gun. When the group returned to Frankfort to pick up the gun, Love testified that they dropped him off at Kevin Evans's house in Frankfort. Evans was a friend of the group. Love did not recall how much time he spent at Evans's house, but Love testified that the rest of the group returned to Evans's house, and they asked him to drive a car to the gas station. Love testified that he did drive the car to the gas station, and when he saw multiple televisions in one of the cars at the gas station he realized that the group had just stolen them. Love testified that the group then went to Capitol View Park where they met Dusean. Love testified that it looked as if Dusean was waiting for them.

When the group got to Capitol View Park, Love testified that someone told him they had also stolen marijuana at the house they had just robbed. Love also testified that Bricelyn told him that shots were fired in the course of

8

the robbery. According to Love, he also learned that the car he had just driven to Capitol View Park was stolen, and he declined to drive it to Lawrenceburg. Love testified that he did, however, travel back to Lawrenceburg with the group where he stayed the next few days until someone could pick him up and drive him back to Frankfort. Love testified that he was later arrested at the Clay Villa Apartments in connection to the Alexander Street robbery. Love testified that he did not participate in the planning of the Alexander Street robbery, that he did not go to the house at 302 Alexander Street with the group, that he did not shoot anyone inside that house, and that he did not receive any money or drugs from that robbery.

Kevin Evans testified that he met Love in May 2018, but that he already knew the group of Dusean, Bricelyn, Rakiethieus, and Juanita. Evans testified that he lived in Frankfort at the time of the Alexander Street robbery, and that the group would often come to his home. Evans testified that Love was at his home on the day of the Alexander Street robbery and the two smoked marijuana on his porch together. Evans also testified that Dusean, Rakiethieus, Bricelyn, and Juanita later showed up to his home in three separate cars—a blue Pontiac, a beige Century, and a black Toyota Camry. Dusean drove a Buick Century. Evans testified that the group was not at his house long, and Love left with the rest of the group.

The Commonwealth also called Crutchfield, the surviving victim, to testify during rebuttal. Crutchfield testified Kevin Evans started a conversation with him in the hallway of the courthouse the prior day, and Evans asked him

9

how long "this shit" usually takes. Crutchfield testified that Evans also told him, "These people are trying to say that that guy was at my house." Crutchfield testified that he asked Evans whether "he was at your house." Crutchfield testified that Evans responded, "That motherfucker wasn't at my house," thereby contradicting evidence of Love's alibi.

The jury convicted Love of two counts of manslaughter in the second degree and two counts of robbery in the first degree. The jury, however, failed to make a sentencing recommendation, and the Franklin Circuit Court sentenced Love to 60 years' imprisonment. Love then appealed to this Court.

## II.  ANALYSIS

On appeal, Love makes four arguments advocating for the reversal of his convictions. First, Love argues that the trial court erred in admitting a slew of prior bad acts evidence in contravention of Kentucky Rule of Evidence (KRE) 404(b). Second, Love argues that the trial court deprived him of his right to present a defense when it excluded evidence relevant to his alternative perpetrator defense. Third, Love argues that the Commonwealth engaged in multiple acts of prosecutorial misconduct. Fourth, Love argues that cumulative error warrants a reversal of his convictions.

This Court, having reviewed the record, the arguments of the parties, and the applicable law, affirms the Franklin Circuit Court.

### A. Evidence of Other Crimes

Prior to trial, the Commonwealth filed notice of its intention to introduce evidence of Love's prior bad acts, pursuant to KRE 404(b). Specifically, the

10

Commonwealth sought to admit evidence of Love's prior involvement in two Frankfort robberies—one at the Triple R Mart gas station on June 8, 2018, and the other at a Papa John's restaurant on June 25, 2018, one day before the Alexander Street robbery. The trial court held a pre-trial hearing on the matter and ruled that the Commonwealth's evidence was admissible over Love's objection. Shortly thereafter, the Commonwealth gave notice of its intention to introduce additional evidence of prior bad acts that had been obtained from Love's cell phone. On the morning of the second day of trial, the trial court overruled Love's objection to this cell phone evidence.[1] On appeal, Love now argues the Commonwealth's KRE 404(b) evidence was admitted in error.

Evidence of prior bad acts is generally inadmissible to prove a defendant's criminal character or his propensity to act in accordance with that character, but such evidence may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). KRE 404(b) is an exclusionary rule. *Darcy v. Commonwealth*, 441 S.W.3d 77, 88 (Ky. 2014). Trial courts must admit evidence under KRE 404(b) "cautiously, with an eye towards eliminating evidence which is relevant only as proof of an

---

[1] Unfortunately, due to issues with the trial court's video recording system, the trial court's rulings on the Commonwealth's KRE 404(b) evidence were not captured on the video record. The parties have, however, entered into an Agreed Narrative Statement detailing their final pre-trial hearing, the second morning of trial, Love's objections, and the trial court's rulings. *See* RAP 25(a). We observe that Love appropriately preserved these issues for our review.

accused's propensity to commit a certain type of crime." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994).

To determine if evidence of prior bad acts is admissible, the trial court considers whether the evidence is relevant for some purpose other than propensity, probative of the actual commission of the bad act, and whether its potential for prejudice to the defendant substantially outweighs its probative value. *Id.* We review the trial court's evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Because of details lacking in the parties' Agreed Narrative Statement, we are left to guess on what legal bases the trial court admitted this assortment of evidence. Regardless, we will not reverse a correct evidentiary decision by the trial judge even if it might have been made for the wrong reason. *Lopez v. Commonwealth*, 459 S.W.3d 867, 875 (Ky. 2015). We review the challenged evidence in turn.

### 1. Prior Robberies

Juanita specifically testified that Love stayed in the car during the Triple R Mart gas station robbery. Juanita testified, however, that Love was involved in planning that robbery and had suggested that the group purchase BB guns to use during the robbery. According to Juanita's testimony, Love played a more active role in the Papa John's robbery. Juanita testified that Love and Rakiethieus both entered the Papa John's restaurant armed with BB guns and

stole cash. Juanita testified that the group planned the Papa John's robbery to obtain enough money to purchase a handgun to use during the Alexander Street robbery the next day. Rakiethieus also corroborated Love's participation in the Papa John's robbery.

Love argues on appeal that the trial court abused its discretion when it failed to exclude the evidence of these prior robberies because the evidence fails each inquiry of the *Bell* analysis. 875 S.W.2d at 889. The Commonwealth conversely argues that the evidence was rightfully admitted to prove Love's "affiliation to the group and his ever-increasing role as the stakes went higher with each robbery." Specifically, the Commonwealth argues evidence of the robberies were relevant to prove Love's identity, and that the evidence was also "inextricably intertwined" with other crucial evidence in the case.

As previously stated, evidence of other crimes may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). Pursuant to KRE 404(b)(2), evidence of prior bad acts may also be admissible if that evidence is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2) has been said to permit the Commonwealth to present a "complete and realistic picture of the crime alleged to have been committed by the defendant, including background, context, setting, and perspective." Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 2.30[3][c] (2023 ed.). While

13

the rule does give the Commonwealth some leeway in providing context to the charged offenses, the rule should not be construed as so flexible as to enable its abuse. "Evidence is inextricably intertwined where 'two or more crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other.'" *Gasaway v. Commonwealth*, 671 S.W.3d 298, 336 (Ky. 2023) (citing *Metcalf v. Commonwealth,* 158 S.W.3d 740, 743 (Ky. 2005)).

In regard to the evidence of Love's involvement in the Triple R Mart robbery, we cannot say that evidence was so "inextricably intertwined" with other evidence essential to the case as to permit its introduction. The Triple R Mart robbery occurred roughly three weeks before the Alexander Street robbery and, therefore, the two crimes were obviously not part of the same criminal transaction. Further, what few details Juanita did share about Love's limited involvement in the Triple R Mart robbery provided little context to his involvement in the Alexander Street robbery. Accordingly, it would not have been impracticable for the trial court to exclude any evidence of the Triple R Mart robbery without prejudicing the Commonwealth's ability to prove Love's later involvement in the Alexander Street robbery.

Nor can we say that evidence of the Triple R Mart robbery was relevant for any purpose other than propensity—especially to prove Love's identity. Simply, none of the evidence related to the Triple R Mart robbery identified Love as the perpetrator of the murders or robbery at 302 Alexander street. Juanita's testimony did little more than to place Love at the scene of the Triple

14

R Mart robbery, and the fact that Love was present at the Triple R Mart robbery did not make it more likely that it was Love who shot the victims of the Alexander Street robbery. The only effect of this evidence was to prove Love's criminal character. We conclude that the trial court abused its discretion in admitting evidence of Love's involvement in the Triple R Mart robbery.

As to the evidence of Love's involvement in the Papa John's robbery, this Court affirms its admission, albeit for different reasons than those now argued by the Commonwealth. We hold that evidence of the Papa John's robbery was most relevant to establish that Love engaged in "preparation" or developed a "plan" in furtherance of the Alexander Street robbery. *See* KRE 404(b)(1). Evidence of other crimes may be admissible where those prior acts can be said to be part and parcel of a greater criminal endeavor which includes the charged offense. *English,* 993 S.W.2d at 945. Evidence of a plan which includes the commission of both the uncharged and charged crimes as steps in that plan therefore proves the commission of the charged offense. Lawson, § 2.30[4][g] (2023 ed.).

Juanita relevantly testified that the group carried out the Papa John's robbery for the specific purpose of obtaining enough money to buy a gun with which to commit the Alexander Street robbery. In this sense, the Papa John's robbery and the Alexander Street robbery can be seen as two steps in the same criminal endeavor. The successful completion of the Papa John's robbery was a means to effectuate the Alexander Street robbery. Therefore, evidence of the Papa John's robbery is relevant to prove commission of the Alexander Street

15

robbery. The Commonwealth's evidence pertaining to Love's involvement in the Papa John's robbery was relevant for some purpose other than propensity.

Further, the Commonwealth's evidence of Love's involvement in the Papa John's robbery was sufficiently probative of the actual commission of that crime as to warrant its admission. *Bell*, 875 S.W.2d at 890. Aside from Juanita's and Rakiethieus's descriptions of Love's involvement in the crime, Juanita also identified Love in a photo taken from the Papa John's security camera footage. This evidence was sufficiently probative to prove Love's involvement in the Papa John's robbery.

Even if evidence of other crimes is relevant for some purpose other than propensity, it may still be excluded if its potential for prejudice outweighs its probative value as to the charged offense. *Id.* "[T]here exists universal agreement that evidence of this sort is inherently and highly prejudicial to a defendant." *Id.* The trial court, however, has a great deal of discretion in balancing the evidence's probative value and its potential for prejudice. *Jenkins v. Commonwealth*, 496 S.W.3d 435, 459 (Ky. 2016). In our review of the evidence, we cannot say that the trial court abused its discretion in admitting evidence of Love's involvement in the Papa John's robbery. This evidence was highly probative to explain how Love came to possess the murder weapon he was alleged to have used in the Alexander Street robbery. As previously stated, Juanita's testimony made it clear that the money obtained from the Papa John's robbery was a necessary prerequisite to the commission of the Alexander Street robbery.

16

## 2. Drug Activity in Wisconsin and Kentucky

At trial, the Commonwealth also introduced a considerable amount of incoming and outgoing text messages extracted from Love's cell phone. It would be unavailing to address each text message individually, so it suffices to state that a large portion of these messages tended to prove that Love sold marijuana and other drugs in Wisconsin and Kentucky. During his own testimony, Love admitted to selling drugs in Wisconsin, however, he denied selling drugs in Kentucky. During the Commonwealth's cross-examination of Love, the Commonwealth's Attorney read some of these messages aloud. Love argues on appeal that the text messages related to his alleged drug activity in Wisconsin and Kentucky were not relevant for any purpose other than propensity. We interpret the Commonwealth's argument as advocating that the messages were relevant to prove Love's motive for the Alexander Street robbery.

"A defendant's motivation to commit [the crime] is often an important issue in criminal trials, perhaps especially in cases like this, where the identity of the perpetrator is disputed and must be proven almost entirely by circumstantial evidence." *Dooley v. Commonwealth*, 626 S.W.3d 487, 494 (Ky. 2021). Motive can, therefore, become a non-propensity basis for offering evidence of the defendant's other crimes or prior bad acts. *Id.* "Where the Commonwealth's motive theory is at least coherent, it is in effect a state-of-mind issue, properly left for the jury to believe or disbelieve." *Id.* at 494–95.

17

We have little difficulty recognizing the relevance of Love's drug activity *in Kentucky* when viewed in the context of the Commonwealth's theory of the case. A consistent theme throughout the Commonwealth's case against Love was that Love wanted to leave Kentucky, but did not have the financial means to do so. The Commonwealth theorized that Love participated in the Alexander Street robbery to steal cash and marijuana in hopes of improving his financial situation. We conclude that any evidence that proved Love was selling drugs in Kentucky *prior* to the Alexander Street robbery was relevant to support the theory that Love was motivated to participate in that robbery to obtain more drugs to sell. We further observe that any evidence of Love's drug activity in Kentucky *after* the Alexander Street robbery would be equally as relevant to prove a successful completion of the Alexander Street robbery. Accordingly, the text messages tending to prove that Love had been selling drugs in Kentucky were relevant to prove motive.

We, however, discern little relevancy in the text messages proving Love's drug activity while he was in Wisconsin. Any illegal drug activity that Love participated in hundreds of miles from, and over a month before, the Alexander Street robbery was far attenuated from any motive he may have had to commit that crime. Evidence of Love's drug activity in Wisconsin did little more than paint him as a persistent criminal, and whatever trace of relevancy it may have had on his commission of the charged offenses was plainly outweighed by its potential for prejudice. Accordingly, we conclude that the trial court abused its discretion in admitting that evidence.

18

### 3. Other Criminal Activity

The Commonwealth also introduced text messages from Love's cell phone detailing an assortment of other alleged criminal activity. We will examine these messages in more detail. Love first focuses our attention on a text thread extracted from his phone that was dated June 1, 2018, a little less than one week before Love arrived in Kentucky. The relevant incoming and outgoing messages in that thread read:

> **Incoming**: Bro you bogus as hell for giving them this address in my phone number like your name is really Cory you could have gave him a bogus ass address and a bogus ass number

> **Incoming**: Your court date was today and they just called me looking for Cory

> **Incoming**: You need to call the owner yourself don't let them know you use Corey's name

> **Outgoing**: I didn't they already had yo num frm wen yall stayed on Burleigh nbs I jus gave em da address

> **Incoming**: Why you didn't give them a false ass address just like you gave them a false as name

These messages, while certainly vague, would seem to imply that Love had provided a false name and phone number to someone, and that he had failed to appear for a court date—two acts that could be reasonably construed as other crimes, wrongs, or bad acts, and which could invite negative character inferences against Love. Upon our review, we fail to see how any of these messages could be relevant to Love's commission of the charged crimes stemming from the Alexander Street robbery, and the Commonwealth makes no argument for their relevancy in its brief. We must conclude that the trial

19

court abused its discretion in admitting these irrelevant messages into evidence.

Love next points our attention to a text thread dated June 20, 2018, six days before the Alexander Street robbery. The relevant incoming and outgoing messages in that thread read as follows:

**Incoming**: I have something I want to share with you but it's going to require some foot work

**Outgoing**: wats that

**Incoming**: Using a different name

**Incoming**: You would get New name New social security number

**Incoming**: But the job is for you to get the ID

**Incoming**: You create a whole new identity

**Incoming**: And not go back to selling drugs or no bull shit

**Outgoing**: really are you serious

**Incoming**: Yes

**Incoming**: But there's also a consequence if it's not complete

**Incoming**: It's all up to you

**Outgoing**: im good on dat thanks anyway

**Incoming**: Okay

**Outgoing**: no offense but thats not gone help my cause . . . thats more charges

Love argues in his brief that the Commonwealth attempted to prove that he had planned to create a new identity, an act which could reasonably be construed as a prior crime, wrong, or bad act. However, the evidence here

20

clearly shows that Love declined any participation in whatever criminal offer he received to create a new identity. This evidence did not serve to prove Love's criminal character or propensity to act in conformance with that character. This was rather evidence of Love declining to participate in criminal activity. KRE 404(b) operates only to exclude "[e]vidence of other crimes, wrongs, or acts." We cannot say the trial court abused its discretion in admitting this evidence.

Finally, Love takes issue with another portion of the above text thread dated June 20, 2018, in which Love purportedly admits to having shot two people. The relevant portions of the text thread read as follows:

> **Outgoing**: that's easy to a person who dnt got 70 years hanging ova they head . . . and the police called my phone
>
> **Incoming**: Facing 70 years and doing 70 years is different!
>
> **Incoming**: You don't know for sure what you're going to get, all of the "70" year belief is irrational and a myth. You didn't kill anyone so why you running man!! You
>
> **Incoming**: didn't rob a bank so why you running!! If I didn't do anything wrong I'm not running. that's just me! Do what makes you happy . . . when you get tired I will
>
> **Incoming**: be here
>
> **Outgoing**: dawg I shot two ppl with an assault rifle and they identified me with my Id and social security card
>
> **Outgoing**: that's why I'm running

During the Commonwealth's cross-examination of Love, the Commonwealth's Attorney again read a portion of this text thread aloud and Love denied that he had ever shot two people with an assault rifle.

21

Love now contends this evidence should have been excluded under KRE 404(b), and specifically argues that these texts were not relevant to the Alexander Street robbery and not sufficiently probative to prove he had actually shot two people. The Commonwealth, on the other hand, argues that this evidence was admissible under KRE 404(b)(2) because it was inextricably intertwined with other evidence in the case.

First, this evidence was not "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the [Commonwealth]." KRE 404(b)(2). The Commonwealth contends that these text messages provide the context for why Love travelled from Wisconsin to Kentucky, but even if that may be true, such a fact is immaterial to establishing his participation in the Alexander Street robbery. While the rule may permit the introduction of evidence that "complete[s] the story of the crime on trial by proving its *immediate* context," it does not permit the Commonwealth to tell a story of other crimes that are wholly independent of the charged offenses. *Ordway v. Commonwealth*, 391 S.W.3d 762, 790 (Ky. 2013) (emphasis added). It would not have been impracticable or unfeasible to exclude this evidence without prejudicing the Commonwealth's case against Love.

Further, we can think of no relevant basis for introduction of this evidence that would have outweighed its extreme potential for prejudice—that prejudice being the "forbidden character inference" that KRE 404(b) is intended to prohibit. *Jenkins v. Commonwealth*, 496 S.W.3d 435, 459 (Ky. 2016). While

22

Love was on trial for allegedly murdering two victims with a handgun, the trial court permitted the Commonwealth to introduce evidence tending to prove that he had previously shot two people with an assault rifle. We can think of little other KRE 404(b) evidence that would have been more prejudicial to Love in this instance. The trial court abused its discretion in admitting this evidence in contravention of KRE 404(b)'s prohibition on evidence of other crimes.

### 4. Harmless Error

"A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Kotteakos*, 328 U.S. at 765)). While the trial court's admission of some of the above evidence was unquestionably error, this Court is satisfied that the erroneous admission of this evidence did not substantially influence Love's conviction.

Love's defenses to the charged offenses were that he was not present at the Alexander Street robbery and that Dusean was the alternative perpetrator who shot and killed the victims of the robbery. However, the strength of the circumstantial evidence against Love was overwhelming. All three of Love's co-defendants consistently testified that Love was present at the Alexander Street

23

robbery and that it was he who fired the gun killing the victims. Love's co-defendants consistently identified him as wearing a distinctive pair of black and white shorts both the night before, and the day of, the Alexander Street robbery. A neighbor who lived across the street from the scene of the robbery testified that she saw a man in black and white shorts at 302 Alexander Street on the evening of the robbery. She also testified that the man in black and white shorts got into a separate car from the rest of his group when they fled the scene. This testimony was consistent with that of Love's co-defendants. Further, the only surviving victim of the Alexander Street robbery, Crutchfield, testified that there was no doubt in his mind that whichever perpetrator stole one of the victims' cars was the perpetrator who fired the shots killing the victims of the robbery. Even Love himself testified that he was present at crucial events both leading up to, and following, the Alexander Street robbery. Love admitted that he accompanied the group to the pawn shop where they purchased the alleged murder weapon and that he drove the stolen vehicle to Capitol View Park after the robbery. Further, Love's only alibi witness, Kevin Evans, was later discredited when Crutchfield testified that Evans told him Love was not at his house at the time of the Alexander Street robbery.

While we acknowledge the overwhelming amount of circumstantial evidence that tended to prove Love's guilt, we also review the admission of the improper evidence of Love's other crimes in the context of his entire trial. Love's trial spanned six days. The jury heard from dozens of witnesses and saw dozens of evidentiary exhibits. In contrast, the improper evidence of Love's

24

other crimes was but a fraction of the evidence admitted against him. The testimony regarding Love's involvement in the Triple R Mart robbery spanned only a few minutes. Likewise, the entirety of the text message evidence against Love, introduced through the Commonwealth's digital forensic analyst, lasted only a few hours. The text message evidence that was improperly admitted was but a small fraction of that evidence. The Commonwealth did, however, briefly reference some of these improperly admitted messages during its cross-examination of Love.

Further, while all evidence of other crimes carries inherent prejudice to the defendant, we observe that *most* of the evidentiary errors in this case did little to seriously impugn Love's character. Evidence of Love's limited involvement in the Triple R Mart robbery and evidence of his prior drug activity in Wisconsin likely had little effect on the jury, because Love himself admitted to engaging in similar acts during his youth. During his own testimony, Love was incredibly forthcoming and did not deny that he had a criminal past. Love did, however, vehemently deny that he had previously shot two people with an assault rifle. As previously stated, admission of this piece of evidence was a grave evidentiary error, and it was this error that likely had the greatest prejudicial effect on the jury's perception of Love's character. Still, in the context of such a long and thorough trial, we are confident that the improper evidence of Love's other crimes was harmless. These errors likely did not "substantially sway[]" the jury's verdict. *Winstead*, 283 S.W.3d at 688–89.

25

## B. Love's Right to Present a Complete Defense

Love next argues that the trial court erred in excluding evidence of Facebook searches conducted by Dusean and a video found on Dusean's cell phone. He argues that these pieces of evidence were admissible as relevant to his defense that Dusean was the alternative perpetrator that murdered the victims of the Alexander Street robbery. Love argues that the exclusion of this evidence violated his right to present a complete defense, as well as his right to a fair trial.

The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007); *English*, 993 S.W.2d at 945. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581 (citing *English*, 993 S.W.2d at 945).

We begin by addressing Love's assertion that the exclusion of the evidence violated his due process right to present a defense. "Under the United States Constitution and the Kentucky Constitution, an accused has a right to present a complete and meaningful defense." *Newcomb v. Commonwealth*, 410 S.W.3d 63, 84–85 (Ky. 2013) (citing *Brown v. Commonwealth*, 313 S.W.3d 577, 624–25 (Ky. 2010)). The right to present a defense, however, "does not 'abrogate the rules of evidence.'" *Id.* at 85 (quoting *McPherson v. Commonwealth*, 360 S.W.3d 207, 214 (Ky. 2012)). The exclusion of evidence, even pursuant to the rules of evidence, violates a defendant's constitutional rights when the

26

exclusion "significantly undermines fundamental elements of the defendant's defense." *Id.* In this case, Love presented significant evidence of his alternative perpetrator defense. Regardless of the validity of the trial court's exclusion of this evidence under the Rules of Evidence, the exclusion certainly did not "significantly undermine[] fundamental elements" of Love's alternative perpetrator defense. *Id.* Thus, we conclude that the trial court did not violate Love's constitutional right to present a defense.

We turn now to the trial court's discretionary decision to exclude Love's proffered evidence. Love first argues that the trial court erroneously excluded evidence that a man named Steven Star commented on a news article about the Alexander Street robbery posted on Facebook and that Dusean then searched for Steven Star on Facebook. Star had commented, "Owed somebody money and they got killed." Love asserts that this evidence showed that Dusean wanted to know what other people knew or were saying about the crimes. He further posits that the evidence showed Dusean had a personal interest in the investigation, and thus it was more likely that he, in fact, committed the Alexander Street robbery/murders and that Love did not.

The trial court apparently excluded this evidence, at least in part, because it was hearsay. We must address this first. "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." KRE 802. Under KRE 801(c), "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It does not appear to this

27

Court that Love was seeking to admit Star's comment for the truth of the statement. Instead, he sought to admit the comment to show that it piqued Dusean's interest and then caused Dusean to search Facebook for Star. Thus, exclusion of this evidence based on a finding that it was hearsay was error.

However, it is unclear that hearsay was the trial court's sole reason for excluding the evidence. Every time evidence is admitted, trial courts are called upon to undertake a relevancy analysis. This Court's review of the record leads us to conclude that the trial court also excluded the evidence after undertaking a relevancy versus probative value analysis. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Under KRE 402, "[a]ll relevant evidence is admissible" unless otherwise prohibited by the Kentucky or United States Constitution, a statute, or rule of this Court. "Evidence which is not relevant is not admissible." *Id.* KRE 403 allows relevant evidence to "be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

In this case, the evidence that Dusean searched Facebook for Star after seeing Star's comment on the news story was only marginally relevant. While it did tend to show that Dusean was interested in the story and the people who had commented on the story, it does little to show that his interest stemmed

28

from his involvement in the crime. It is just as likely that he was interested because he believed his brother and friends had committed the crime. Further, the trial court could have believed that the evidence would have confused the jury or unduly delayed the trial. We cannot hold that the trial court abused its broad discretion in excluding the Facebook evidence.

Love also argues that the trial court erred in prohibiting testimony regarding a video recovered from Dusean's phone. Love alleges that the video shows Dusean shooting and killing a dog in cold blood. At trial, Love did not seek to admit the video itself but instead sought to have Tom Bell, a forensic phone analyst, describe its contents to the jury. Love argued to the trial court that the contents of the video were relevant because it showed Dusean lied when he testified that he did not own a gun in June 2018 when the video was taken, it served to impeach Dusean's portrayal of himself as an animal lover, and it established that the firearm was an operable firearm. The trial court allowed Bell to testify that the video was taken on June 1, 2018, that Dusean discharged the firearm in the video, and that the firearm was in working order. The trial court excluded any further description of the video.

To this Court, Love argues that the trial court erred in excluding the video in part because Dusean's alleged killing of his dog in cold blood showed that he lacked empathy and made it more likely that he shot and killed the victims of the Alexander Street robbery. This is classic "reverse 404(b)" evidence, that is, "evidence of an 'aaltperp's' other crimes, wrongs, or acts offered by the defendant to prove that the 'aaltperp' committed the offense with

29

which the defendant is charged." *Beaty v. Commonwealth*, 125 S.W.3d 196, 215 n.4 (Ky. 2003), *abrogated on other grounds by Gray v. Commonwealth*, 480 S.W.3d 253 (Ky. 2016) (citing *U.S. v. Stevens*, 935 F.2d 1380, 1401–06 (3rd Cir. 1991)).

"It is well established that a defendant may use similar 'other crimes' evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him." *Blair v. Commonwealth*, 144 S.W.3d 801, 810 (Ky. 2004) (quoting *Stevens*, 935 F.2d at 1404). However, as with all alternative perpetrator evidence, "[a]t its heart, the critical question . . . is one of relevance: whether the defendant's proffered evidence has any tendency to make the existence of any consequential fact more or less probable." *Gray*, 480 S.W.3d at 267. We have further explained that "the balancing test found in KRE 403 is the true threshold for admitting alternative perpetrator evidence." *Id.* As explained above, KRE 403 excludes even relevant evidence "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The evidence excluded in this instance—Bell's description of a video depicting Dusean's murder of his own dog—has little relevance in the jury's determination of whether Dusean committed the robbery/murder with which Love was charged. Further, any minimal probative value it did have was almost certainly "substantially outweighed by the danger of undue prejudice." KRE

30

403. Unduly prejudicial evidence is not just evidence which damages the defendant's case. *Ten Broeck Dupont, Inc. v. Brooks,* 283 S.W.3d 705, 716 (Ky. 2009). Instead, it is evidence that tends "to suggest a decision based on improper consideration[.]" *Id.* "Evidence is [unduly] prejudicial only if ... it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Id.* (quoting *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir. 1980)). The prejudice resulting from the admission of the evidence must be "unnecessary and unreasonable." *Id.* (quoting *Partin v. Commonwealth,* 918 S.W.2d 219, 223 (Ky. 1996), *overruled on other grounds by Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky. 2008)).

Bell provided avowal testimony regarding his description of the video. He explained that the video was 49 seconds long and began with a dog cowering in the corner. The dog was shot once and screamed and flailed about. There was blood all over the apartment walls and carpet. The dog was then moved up against a wall. Then there was a second shot. The dog was shown on its side, still screaming, and there was blood on the carpet. A third shot was then fired. The dog was silent but quivered and shook.

Even this brief description is enough to make clear that most jurors would likely have a very emotional response to the evidence if it had been admitted. It certainly was not an abuse of the trial court's discretion to find that the evidence would "appeal[] to the jury's sympathies or arouse[] its sense

of horror" such that the danger of undue prejudice substantially outweighed the minimal relevance of the evidence. *Id.*; KRE 403. Accordingly, the trial court did not err in excluding Bell's description of the video.

### C. Prosecutorial Misconduct

Love argues that 10 instances of prosecutorial misconduct warrant a reversal of his convictions. "Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (citing *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011)). Prosecutorial misconduct can take many forms, "including improper questioning and improper closing argument." *Id.* (citing *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)). This Court analyzes a defendant's allegation of prosecutorial misconduct in the context of the overall fairness of the trial. *Commonwealth v. McGorman*, 489 S.W.3d 731, 742 (Ky. 2016) (citing *St. Clair v. Commonwealth*, 451 S.W.3d 597, 640 (Ky. 2014)). In order for prosecutorial misconduct to warrant a reversal of the defendant's convictions, the misconduct must be so serious as to render the entire trial fundamentally unfair. *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky. 2004).

"If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Robinson v. Commonwealth*, 647 S.W.3d 136, 143 (Ky. 2022)

(quoting *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)). As previously stated above, the evidence against Love was overwhelming and compelling. However, if the allegation of prosecutorial misconduct was not objected to at trial, we will only reverse where the misconduct is flagrant. *St. Clair*, 451 S.W.3d at 640 (citing *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002)).

> To determine whether improper conduct is flagrant and requires reversal, this Court weighs four factors: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*Barrett v. Commonwealth*, 677 S.W.3d 326 (Ky. 2023) (citing *Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020)).

### 1. Commonwealth's audible objection during Juanita's testimony

For his first allegation of misconduct, Love takes issue with the manner in which the Commonwealth objected to defense counsel's cross-examination of a witness. During Juanita's testimony, the parties held a bench conference regarding photos recovered from Juanita's phone that Love sought to introduce. The trial court instructed defense counsel to ask Juanita if she recognized the photos, whether she took the photos, or whether the photos were merely sent to her. When the bench conference ended, defense counsel returned to questioning Juanita and stated: "Now I am going to show you four separate photos. I want you to tell me whether you recognize these photos, whether they were taken on your phone, they were sent to you, whatever. Do

33

you recognize that picture?" The Commonwealth objected aloud, within earshot of the jury: "Now wait a minute, that's not the way you were told to ask the question." The parties approached the bench and defense counsel asked the Commonwealth's Attorney to object and approach the bench rather than state the basis for his objection aloud.

We can certainly say that it would have been "[b]etter practice . . . for any discussion regarding an objection (including the grounds for the objection, any response thereto, and the trial court's ruling) to have occurred at the bench outside the hearing of the jury." *Mayo v. Commonwealth*, 322 S.W.3d 41, 52 n.13 (Ky. 2010). However, we cannot say that the Commonwealth's remarks were made in an "attempt to persuade the jury to wrongly convict [Love] or assess an unjustified punishment." *Dickerson*, 485 S.W.3d at 329. The Commonwealth's objection did not amount to prosecutorial misconduct.

### 2. Commonwealth's implication that the defense harassed Dusean

During Dusean's cross-examination, he testified that the defense team's investigator had harassed him by continuously calling his place of work. Dusean also testified that he lost his job as a result of the defense investigator's alleged harassment. During the Commonwealth's closing argument, the Commonwealth's Attorney referenced Dusean's testimony and stated that, "[Dusean] went back to Illinois, got a job, was working steadily . . . only to lose that job as a result of the persistent efforts of this defense team to bring him in here and tie him up and pin these murders on him." This Court struggles to make sense of Love's precise legal argument on appeal, but it

34

seems that he takes offense with both the admission of Dusean's testimony and the Commonwealth's reference to that testimony during closing arguments. Love states that Dusean's testimony accused the defense investigator of unethical behavior and that the Commonwealth's Attorney later "spread" that accusation to the rest of the defense team during closing arguments.

First, we state that "[i]ssues involving the admission of evidence or testimony, when ruled upon by the trial court, do not constitute prosecutorial misconduct." *St. Clair*, 451 S.W.3d at 640. Whatever issues Love may have with the admission of Dusean's testimony cannot be the basis for an allegation of prosecutorial misconduct. Second, we note that trial counsel is granted "wide latitude during closing argument." *Robinson*, 647 S.W.3d at 143 (citing *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006)). "It is well-established that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn from it." *Id.* (citing *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010)). While the Commonwealth's statements at closing argument could reasonably be interpreted as accusatory, we discern no error in simply reiterating the testimony of a witness. The Commonwealth's Attorney's statement was accusatory because Dusean's testimony was accusatory. Further, in regard to the Commonwealth's statement that the defense was attempting to "pin" the murders on Dusean, we note that at least a portion of Love's defense relied on the theory that Dusean was a plausible alternative perpetrator. While the Commonwealth's Attorney's choice of the words "pin

35

these murders" was perhaps inflammatory, we cannot say this statement amounted to prosecutorial misconduct.

### 3. Commonwealth's comment during Dusean's testimony

During Dusean's testimony, he denied ever having been to Taylorsville Lake where officials recovered the 9mm handgun and two BB guns. On cross-examination, Love sought to introduce a video that appeared to depict one of Dusean's dogs near a body of water to rebut this claim. The Commonwealth objected to the admission of the video because it was labeled "lake video." Defense counsel responded that there would be rebuttal on the matter, and the Commonwealth stated aloud in front of the jury, "Promises, promises." At an ensuing bench conference, defense counsel objected that the Commonwealth's comment was inappropriate. On appeal, Love argues that the Commonwealth implied "that the defense was making things up and would never follow through."

While we emphasize the necessity of maintaining proper courtroom decorum throughout trial, especially in front of the jury, we decline to read any malice into the Commonwealth's comment. Regardless, such a comment is obviously not "so serious as to render the entire trial fundamentally unfair." *Soto,* 139 S.W.3d at 873. We will not reverse Love's convictions on this basis.

### 4. Commonwealth's comments as to relevancy of defense exhibit

During his cross-examination of Bricelyn, Love sought to introduce a photo of Dusean's car, a Buick Century. When the trial court asked whether the Commonwealth had any objection to the photo's admission, the

36

Commonwealth stated aloud in front of the jury, "I don't see how it's relevant. Put it in. It's fine." Defense counsel did not make a contemporaneous objection to the Commonwealth's statement. Shortly thereafter, Love sought to introduce evidence of Bricelyn's internet search history which tended to prove that he had searched for firearms in the days leading up to the Alexander Street robbery. When the trial court asked whether the Commonwealth had any objection to the admission of the evidence, the Commonwealth replied, "Again." Defense counsel then objected to the Commonwealth's "continued commentary."

While it may have been better practice for the Commonwealth to voice any objection to the admission of the evidence at the bench, out of earshot of the jury, we cannot say that the Commonwealth's statements were made in an "attempt to persuade the jury to wrongly convict [Love] or assess an unjustified punishment." *Dickerson*, 485 S.W.3d at 329.

### 5. Commonwealth's comments on cross-examination of Brian Hager

The defense called Brian Hager to testify as to his observations the day of the Alexander Street robbery. Hager lived at 308 Alexander Street. Hager testified that he heard gunshots soon after he arrived home from work, looked out of his front door toward 302 Alexander Street, and saw a person get into a car and drive away. Hager testified that the car was tan or maroon. When shown a photo of Dusean's car, Hager testified that it looked similar to the car he saw the day of the Alexander Street robbery. On cross-examination, the Commonwealth noted that there was some space and some trees between

37

Hager's residence at 308 Alexander Street and the scene of the robbery at 302 Alexander Street. The Commonwealth stated, "I was there. I looked at it. I mean I took a photo of it from your front door, and you can't even see 302." Defense counsel objected that the Commonwealth's Attorney was testifying as a witness, and the trial court overruled the objection.

We can state with fair assurance that it was improper for the Commonwealth to assert his own personal knowledge of the crime scene before the jury. SCR 3.130(3.4)(e) (A lawyer shall not . . . in a trial . . . assert personal knowledge of facts in issue except when testifying as a witness[.]"). This prohibition "is not only to avoid the obvious biases an attorney has as advocate for her own client but also because 'improper suggestions, insinuations, and, especially, assertions of personal knowledge [made by a prosecutor] are apt to carry much weight against the accused when they should properly carry none.'" *Fisher v. Commonwealth*, 620 S.W.3d 1, 13 (Ky. 2021) (citing *Holt v. Commonwealth*, 219 S.W.3d 731, 737 (Ky. 2007)). The Commonwealth's actions, however, do not require reversal. The Commonwealth's Attorney's assertion of this peripheral fact was not "so serious as to render the entire trial fundamentally unfair." *Soto*, 139 S.W.3d at 873. We are satisfied that this error was harmless and did not contribute to Love's conviction.

Later, on re-direct examination of Hager, defense counsel asked Hager to read a portion of his prior statement to police. When Hager had finished reading the statement aloud, the Commonwealth's Attorney stated aloud, "And also." The Commonwealth then asked that Hager be permitted to read the rest

38

of his statement. A bench conference ensued, and defense counsel objected to the Commonwealth's interruption of her examination of the witness. The trial court told the Commonwealth to wait its turn. Love now argues that the Commonwealth "attempted to take over [defense counsel's] re-direct of Mr. Hager by directing the witness to continue reading his interview."

It seems to this Court that the Commonwealth's ill-timed comment was improper, but such an inconsequential error does not warrant a reversal of Love's convictions. We cannot say that the Commonwealth's error was "so serious as to render the entire trial fundamentally unfair." *Soto,* 139 S.W.3d at 873.

### 6. Commonwealth's comments during cross-examination of Cameron Murphy

Cameron Murphy took the stand in Love's defense and testified that Rakiethieus had previously robbed his family at gunpoint. During the Commonwealth's cross-examination of Murphy, the Commonwealth asked whether "Dusean Leake, the name Dusean Leake's never come up here has it?" Presumably, the Commonwealth's question attempted to elicit testimony from Murphy regarding whether Dusean was at all involved in the robbery of his family. Defense counsel objected to Commonwealth's question and argued at the ensuing bench conference that discovery in the case *did* indicate that Dusean had previously told someone that a gun he owned was used during the robbery of Murphy's family. At the bench conference, the trial court stated that it would exclude this evidence as hearsay. Love argues on appeal that the

Commonwealth improperly testified when it said that Duesan's name had never come up, when in fact it had come up.

In our review of the record, it seems evident that the Commonwealth was asking the witness whether Dusean's name had ever been mentioned in connection to the robbery of Murphy's family. We cannot say that the Commonwealth was improperly testifying by asking the witness a question. Such was within the proper bounds of cross-examination.

### 7. Commonwealth's questions on cross-examination of Ron Justice

Love called Ron Justice, who was incarcerated with Rakiethieus, to testify during his defense. Justice testified that while the two were incarcerated, Rakiethieus told him that Love was not at the scene of the Alexander Street robbery. Justice testified that Rakiethieus told him that the group had decided to accuse Love of the robbery because they were angry with Love for choosing not to participate in the robbery. Justice also testified that Rakiethieus told him that Rakiethieus and Juanita had contacted the victims of the Alexander Street robbery shortly before the robbery to see if they were home. During the Commonwealth's cross-examination of Justice, the Commonwealth asked Justice who his attorney was. Justice testified that he had previously been represented by one of Love's defense counsel, Ms. Gonzales. Love objected to this testimony, but the trial court overruled that objection and ruled that Justice's testimony was relevant to prove bias. Shortly thereafter, the following exchange took place:

> **Commonwealth**: So [Rakiethieus's] and [Juanita's] phones that we've had in this case never appeared on the victim's phones as I recall. Does that surprise you?
>
> **Justice**: I have nothing to do with that.
>
> **Commonwealth**: Because you're just here represented by Ms. Gonzales . . .

At this point, Love objected to this line of questioning again, and the trial court quickly overruled the objection.

> **Commonwealth**: . . . saying [Rakiethieus] told you this with incredible factual accuracy?
>
> **Justice**: She never advised me to do nothing. I'm doing this on my own account.
>
> **Commonwealth**: Right. You're completely doing this on your own account. That's just entirely factually accurate.

Love now argues on appeal that the Commonwealth "very strongly suggested to the jury that Ms. Gonzales had influenced Ron Justice's testimony."

Upon our review of the record we cannot say that the Commonwealth's line of questioning amounted to prosecutorial misconduct. The Commonwealth was indeed entitled to cross-examine Justice regarding any potential biases that may have influenced his testimony, but we caution the Commonwealth against invading the jury's role as factfinder during cross-examination. When the Commonwealth inserts its own conclusions about the evidence, or the credibility of the witness, into cross-examination, whether by direct statement or overt insinuation, it begins to run outside the bounds of legitimate cross-examination. Argument should appropriately be reserved for closing.

### 8. Commonwealth's comment during cross-examination of Morgan Crutchfield

Love called Morgan Crutchfield, the only surviving victim of the Alexander Street robbery, to testify. Crutchfield testified that he spent nearly a year incarcerated as a result of the robbery. Crutchfield was arrested in 2018 and released from incarceration in 2019. Crutchfield testified that his criminal charges stemming from the robbery were dismissed in 2021. In response to that testimony, defense counsel stated, "OK, so even two years after you were released." On the Commonwealth's cross-examination of Crutchfield, the Commonwealth began by stating, "To clarify the last item that was discussed, Ms. Gonzales very slyly threw it out that your case was dismissed two years after the indictment. I have here an order dismissing this case with prejudice dated March 5, 2020." Crutchfield apologized for the inaccuracy, but stated that his charges had been dismissed roughly two years after he was charged. Love did not make a contemporaneous objection to the Commonwealth's remarks. However, on appeal, Love argues that the Commonwealth's characterization of defense counsel as "sly" was improper.

While the Commonwealth's remark was perhaps lacking in decorum, we cannot say that such a negligible comment was "an attempt to persuade the jury to wrongly convict [Love] or assess an unjustified punishment." *Dickerson*, 485 S.W.3d at 329. There was no misconduct here.

### 9. Commonwealth's additional comments during cross-examination of Morgan Crutchfield

Shortly after the above exchange during Crutchfield's testimony, Crutchfield testified generally that his criminal charges made it difficult to obtain a job and live after being released from his incarceration. The following exchange then occurred:

> **Commonwealth**: Right. It's very dangerous the lies that can be spun by people to try to accuse things (sic) of other crimes.
>
> **Crutchfield**: I don't understand how you mean.
>
> **Commonwealth**: I think everybody else does. It doesn't have anything to do with you.

Love did not make a contemporaneous objection to the Commonwealth's statements. Love now argues on appeal that the Commonwealth improperly suggested that the defense was lying during its presentation of its alternative perpetrator evidence.

This Court fails to discern any misconduct in the Commonwealth's statement, principally because that statement is extraordinarily cryptic. Like Crutchfield, we do not fully understand the Commonwealth's comments or know to whom they were directed. We cannot say these remarks amounted to prosecutorial misconduct.

### 10. Commonwealth's closing arguments regarding fingerprint evidence

During its closing argument, the Commonwealth remarked on the lack of fingerprint evidence recovered from the crime scene at the Alexander Street

43

robbery, which was a point of emphasis during the defense's own closing argument. Specifically, the Commonwealth stated,

> Fingerprints at the scene. You know I've been involved in so many cases. I've been doing this in this courthouse since 1978. Do you know how many cases I've had where there was fingerprint evidence, where there was (sic) latent prints of comparison value at the crime scene? None. Never have I had a fingerprint, a latent print.

Love then objected to the Commonwealth's argument, and argued that the Commonwealth was improperly testifying during closing argument. The trial court overruled the objection. Love now likewise argues on appeal that the Commonwealth improperly argued facts that were not in the record.

Again, counsel is granted wide latitude during closing arguments. *Robinson*, 647 S.W.3d at 143 (citing *Brewer*, 206 S.W.3d at 350). "The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017) (citing *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010)). Counsel has a duty, however, to confine his argument to the facts in evidence. *Driver v. Commonwealth*, 361 S.W.3d 877, 889 (Ky. 2012). The Commonwealth's Attorney's statement regarding his own personal experience with fingerprint evidence was not simply a comment on the evidence introduced at trial, but rather a foray into matters outside of evidence. By interjecting his own personal experiences with fingerprint evidence, the Commonwealth's Attorney placed his own credibility in front of the jury. The Commonwealth's argument strayed

outside the bounds of permissible closing argument. We cannot say, however, that, in the context of the whole argument, such a comment warrants a reversal of Love's convictions. The statement was not "so serious as to render the entire trial fundamentally unfair." *Soto*, 139 S.W.3d at 873.

### D. Cumulative Error

Love finally argues that cumulative error warrants a reversal of his convictions. Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown*, 313 S.W.3d at 631. "If the errors have not 'individually raised any real question of prejudice,' then cumulative error is not implicated." *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (quoting *Brown*, 313 S.W.3d at 631).

Errors inevitably creep into trials as long and complex as this one. *Brown*, 313 S.W.3d at 631. Such is obviously regrettable. The errors we have observed here, however, did not "individually or cumulatively" render Love's trial unfair. *Id.* As observed above, most of the errors throughout this six-day trial likely had little effect on the jury.

At the close of evidence, the jury was predominantly tasked with finding the truth between two competing versions of events. We cannot fault the jury for choosing to believe Love's co-defendants' version of events over his own. We will not reverse Love's conviction on the basis of cumulative error.

45

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the Franklin Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew Robert Krygiel
Assistant Attorney General